**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO**

**HUMAN RIGHTS DEFENSE CENTER,**

**Plaintiff,**

**v.**                                                             **1:24-CV-01091-MIS-KRS**

**MICHELLE LUJAN GRISHAM,**
individually and in her capacity as Governor of
the State of New Mexico; **ALISHA TAFOYA LUCERO,**
individually and in her capacity as
Cabinet Secretary of the New Mexico
Corrections Department; **MELANIE
MARTINEZ,** individually and in her capacity
as Deputy Secretary of the New Mexico
Corrections Department; **GARY MACIEL,**
individually and in his capacity as Deputy
Secretary of the New Mexico Correction
Department; **BRIAN R. EVANS**, individually
and in his capacity as Chief Executive Officer
of The GEO Group, Inc.; **WAYNE H.
CALABRESE,**  individually and in his capacity
as President and Chief Operating Officer of The
GEO Group, Inc.; **THE GEO GROUP, INC.
d/b/a LEA COUNTY CORRECTIONAL
FACILITY,** a corporation**; JOHN AND JANE
DOES 1-20,** individually and in their official
capacities; and **ENTITIES 1-10,**

**Defendants.**

**<u>DEFENDANTS RESPONSE TO PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF</u>**

COME NOW Defendants, by and through their counsel of record, **CARRILLO LAW

FIRM, P.C.** (Raúl A. Carrillo, Jr.) and submit this response to the Plaintiff's Motion for

Injunctive Relief.

**INTRODUCTION**

Plaintiff's request for a preliminary injunction is an unwarranted and extreme request

that is overbroad and far outweighs the potential harm which would be inevitable if a preliminary

1

injunction were granted. In short, Plaintiff alleges that approximately one hundred and fifty-two (152) items of correspondence were censored, because they were not delivered to the intended recipients. The relief requested is far out of proportion with the alleged irreparable harm inflicted, because Plaintiff has not shown that there was a deprivation of a constitutionally protected right or that harm occurred, because they have not shown that the materials were in fact censored, as opposed to mislabeled or returned for another reason, because the policy at issue is rationally related to a legitimate and neutral government interest, because there was no denial of due process rights absent the denial of a protected right and because the relief of a mandatory injunction sought is not favored by the Courts.

## STATEMENT OF FACTS

1. Plaintiff provided an alleged business record, which purports to be a spreadsheet of correspondence and publications which Plaintiff sent to the listed incarcerated persons and which were censored by the Defendants. *See,* Declaration of Wright [Doc. 3-2] pg. 20 - 25.

2. Upon preliminary investigation it appears at least two (2) of the listed persons who the Plaintiff alleges they sent publications to were not incarcerated at the listed facility at the time. *See,* Ex. 1.

3. The attached screenshots are from the "Criminal Management Information System," the offender management system utilized by the New Mexico Department of Corrections in its regular course of duty . *See, id.*

4. According to Plaintiff's record, Blessed Omoobajesu was supposed to be at Southern New Mexico Correctional Facility ("SNMCF") on June 4, 2024. *See,* [Doc. 3-2] pg, 21

5. However, this is incorrect as Blessed Omoobajesu was actually located at Northeast New Mexico Correctional Facility ("NENMCF") beginning on May 31, 2024. *See,* Ex. 1

6. Likewise, according to Plaintiff's record, Edward Salas was supposed to be located at NENMCF on March 27, 2024, but he was actually housed at Penitentiary of New Mexico ("PNM") beginning March 4, 2024. *See,* [Doc. 3-2] pg. 22 and Ex. 1.

7. Defendant GEO Group has also highlighted the same issue in their Response [Doc. 19] in the case of four allegedly censored items sent to Marcos Aragon who was likewise not housed at their facility at the time the Plaintiff alleges he was. *See,* Response [Doc. 19 pg. 9], [Doc. 19-1], and [Doc. 19-5].

8. Plaintiff alleges that it attempted to contact the NMCD regarding censorship on May 18, 2022 and again on June 8, 2023 via letter but it received no response. *See,* Motion for Preliminary Injunction [Doc. 3] pgs. 10-11 and [Doc. 3-2].

9. Plaintiff is once again incorrect, as the Defendants provided Plaintiff a written response on July 28, 2023. *See, Ex. 2 Letter from Brenden J. Murphy dated (7/28/2024)*.

10. The letter was sent to HRDC's  Litigation Director and General Counsel EJ Hurst II, and included a copy of the NMCD's grievance policy – so that Plaintiff could properly file its grievance. *See, id.*

11. The letter also included a number of queries from the NMCD to the Plaintiff as to how they could better accommodate providing the Plaintiff's publications to the persons within their facilities including, "Would NMCD purchasing and making Human Rights Defense Center's publications available to inmates in facility libraries address your concerns?", "Do you offer digital subscriptions to the content in your print magazines that could be viewed on e-readers or tablets?", and "Do you offer back issues?" *See, id.*

12. Plaintiff did not send any response to the NMCD's letter, and based on their filings here appears unaware of the letter.

13. Beginning in July 2024 the NMCD has begun implementing Smart Communications tablets for providing mail service to inmates at the facilities operated by NMCD. NMCD published this information to the public on June 20, 2024 on the NMCD website under "Inmate Mail Information." *See, Ex. 3 Notice from NMCD on June 20, 2024.*

### STANDARD OF REVIEW

"We review the district court's decision to deny a preliminary injunction for abuse of discretion." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003). For there to be such an abuse, the "decision [must be] premised on an erroneous conclusion of law or ... [find] no rational basis in the evidence." *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016) (internal quotation marks omitted). This means that "we review the district court's factual findings for clear error and its conclusions of law de novo." *Id*. S*ee, Schwab v. Kansas;* 691 Fed.Appx. 511, 514.

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). "A preliminary injunction has the limited purpose of preserving the relative positions of the parties until a trial on the merits can be held." *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1269–70 (10th Cir. 2018)(citation and internal quotation marks omitted.) "A party may be granted a preliminary injunction only when monetary or other traditional legal remedies are inadequate, and the right to relief is clear and unequivocal." *Id*. (citation and internal quotation marks omitted).

In conducting its review, a court must determine whether the moving party can demonstrate: "(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." *Attorney Gen. of Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009)

A mandatory injunction such as the one the Plaintiff seeks in this case is particularly disfavored by the Courts and must meet a heavier burden because they place the court in a position in which it must provide ongoing supervision to assure that the injunction is appropriately adhered to by the non-movant:

> In *SCFC ILC, Inc. v. Visa USA, Inc.*, this court identified the following three types of specifically disfavored preliminary injunctions and concluded that a movant must 'satisfy an even heavier burden of showing that the four [preliminary injunction] factors ... weigh heavily and compellingly in movant's favor before such an injunction may be issued': (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits. 936 F.2d 1096, 1098–99 (10th Cir.1991). *See, O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004), aff'd and remanded sub nom. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006).

The injunction Plaintiff seeks here is a mandatory injunction because it seeks an affirmative action from the non-movant. In addition, the injunction requested here seeks to change the *status quo* prior to trial which is at odds with the intended purpose of the preliminary injunction which is to preserve the relative positions of the parties until a trial on the merits:

> The underlying purpose of the preliminary injunction is to "preserve the relative positions of the parties until a trial on the merits can be held." *Camenisch*, 451 U.S. at 395, 101 S.Ct. 1830; *see also* 11A Charles Alan Wright et al., Federal Practice and Procedure § 2947, at 123 (2d ed.1995) [hereinafter "Wright & Miller"] (noting that the purpose of the preliminary injunction is to assure that the non-movant does not take unilateral action which would prevent the court from providing effective relief to the movant should the movant prevail on the merits). Although the prevention of harm to the movant is certainly a purpose of the preliminary

injunction, it is not the paramount purpose. *See* Wright & Miller § 2947, at 123 (noting that although the prevention of harm to the movant is an important factor to be considered in deciding whether to grant a preliminary injunction, the primary purpose for such an order is "the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act"). Because a preliminary injunction which alters the status quo is generally contrary to this traditional purpose, such an injunction deserves some form of heightened scrutiny. See id. § 2948, at 133–35 & n.11 (collecting cases for proposition that "the purpose of the preliminary injunction is the preservation of the status quo and that an injunction may not issue if it would disturb the *978 status quo"). *See, O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft,* 389 F.3d 973, 977–78 (10th Cir. 2004), aff'd and remanded sub nom. *Gonzales v. O Centro Espirita Beneficiente Uniao do Vegetal,* 546 U.S. 418 (2006).

The type of injunction requested by the Plaintiff here falls into the category of those injunctions which are not favored by the Court and which are only granted in extraordinary circumstances.

## ARGUMENT

I.  **PLAINTIFF HRDC CANNOT MEET THE ELEMENTS NECESSARY TO ESTABLISH THAT DEFENDANTS' POLICY IS UNCONSITUTIONAL UNDER THE *TURNER* TEST**

a.  **The Plaintiff's claims of success on the merits of its claims are premature at this time as no discovery has been undertaken.**

The Plaintiff alleges that its First Amendment rights are being violated by the Defendant, because the Defendants have "censored" materials which the Plaintiff publishes and distributes to incarcerated persons within New Mexico. Plaintiff's allegations regarding censorship focus on claims that material were not properly delivered and was returned to them. Notably the Plaintiff states that there are over a thousand other subscriptions letters and materials which were, to their knowledge, properly received by persons who were incarcerated by NMCD in the same time frame. *See,* [Doc. 3 pg. 8]. It is premature to believe that this small percentage of materials was conspiratorially censored by the Defendants. Plaintiff included a spreadsheet which it keeps in the course of their regular business, which claims to show a number of returned items sent by the

Plaintiff to people incarcerated in only four (4) of the facilities administered by the Defendants: Southern New Mexico Correctional Facility ("SNMCF"), Penitentiary of New Mexico ("PNM"), Central New Mexico Correctional Facility ("CNMCF"), and Northeast New Mexico Correctional Facility ("NENMCF"). *See,* [Doc. 3-2 Ex. A]. In these four facilities materials were allegedly not received by the following twenty-three (23) persons over the course of two (2) years: Frank Dombos, Steve Duran, Raymond Paiz, Marcos Aragon, Francisco Lujan, Hector Torres, Mario Chavez, Marcos Aragon, Francisco Martinez, Edward Salas, Mark Cochran, Bryce Franklin, Jasen Miller, James Crawley, Blessed Omoobajesu, Bernardino Baca, Delmar Newman, Robert Wolf, Kevin Ogden, Matthew Sloan, Danielle Yazzie, Thomas Montoya, and John Wilcox. *See, id.* Based on the evidence        provided so far this claim is limited only to operations happening at the four facilities listed above, and is limited to a small percentage of incarcerated persons over a two year period.

The evidence submitted today by the plaintiff's appears to be unreliable.  As shown above the Plaintiff has alleged a number of items were inappropriately censored, but upon a preliminary review it appears that Plaintiff simply sent a number of those items to the wrong address. Nevertheless, the Plaintiff would have the Court grant an injunction against the Defendants when they have not afforded the Defendants the opportunity to conduct in depth discovery to determine if the assertions made by the Plaintiff are accurate. Discovery is likely to reveal numerous reasons why materials were not processed or received exclusive of the Defendants alleged censorship. Defendants have not been afforded the opportunity to fully investigate the Plaintiff's claims at this time and have been given the opportunity to fully examine the documents provided by the Plaintiff to determine if they are accurate.  Plaintiff is correct that the materials which were returned may not have been marked appropriately,

however, assuming a malicious intent or any intent to deprive incarcerated persons their rights is not currently supported by the small - and unverified- offering in the Complaint and Motion for Preliminary Injunction.

1. **Defendants policy is rationally related to the legitimate and neutral government interest in maintaining prison security.**

Plaintiff's base their argument on their ability to meet the elements of the *Turner* test. *See,* [Doc. 3 pg. 13]. Under the *Turner* test prison policy must be reasonably related to a legitimate penological interest. *See, id.* Plaintiff has provided a summarized version of the Turner test which was used in *Cook* and is again quoted here:

> (1) whether the regulation is rationally related to a legitimate and neutral government objective; (2) whether there are alternative avenues that remain open to the inmates to exercise the right; (3) the impact that accommodating the asserted right will have on other guards and prisoners, and on the allocation of prison resources; and (4) whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials. *See,* [Doc. 3 pg. 13].

The *Turner* Court summarized this in their ruling and stated, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *See, Turner v. Safley*, 482 U.S. 78, 89 (1987). The Court adopted this intermediate scrutiny standard, rather than the strict scrutiny standard, due to the need for prison administrators to have flexibility in the administration of their duties, and so that the Courts would not become the primary arbiters of what constituted the best solution to prison administrative problems:

> In our view, such a standard is necessary if "prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations." *Jones v. North Carolina Prisoners' Union*, 433 U.S., at 128, 97 S.Ct., at 2539. Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decision making process, for every

administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby "unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration." *Procunier v. Martinez,* 416 U.S., at 407, 94 S.Ct., at 1808. *See, Turner v. Safley*, 482 U.S. 78, 89 (1987).

The *Turner* test itself came about as a means of preventing the Court from unnecessarily interfering with the administration of the prisons.

Here, NMCD has a correspondence policy relating to the processing of materials intended for persons under their administration. This policy is directly related to a legitimate and neutral governmental interest, i.e the safe and effective administration of the prisons. The policy may be critiqued by the Plaintiff but it is clearly rationally related to the intended, legitimate, and neutral government interest. Under the standard articulated in *Turner* the Plaintiff would need to show that the policy is so remotely unrelated to the stated interest, as to make it irrational or arbitrary, "Thus, a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *See, Turner v. Safley*, 482 U.S. 78, 89–90 (1987). The logical connection between the policy NMCD 151200 is very clear and simple: Defendants have a duty to provide for the efficient, safe, and healthy administration of the prisons, and the legitimacy of these regulations is beyond question, "The legitimacy of the Government's purpose in promulgating these regulations is beyond question. The regulations are expressly aimed at protecting prison security, a purpose this Court has said is 'central to all other corrections goals.' *Pell v. Procunier*, 417 U.S., at 823, 94 S.Ct., at 2804." *See, Thornburgh v. Abbott,* 490 U.S. 401, 415 (1989) and "'Space, health and safety are legitimate and neutral penological interests ...' *Jones*, 503 F.3d at 1153." *See, Prison Leg. News*

*v. Cnty. of Bernalillo,* No. 15 CV 107 JAP/KBM, 2015 WL 13662872, at *7 (D.N.M. June 16, 2015).

The mail policy at issue here provides numerous regulations which are intended to achieve this end, including the mail screening process, which is required to prevent the introduction of contraband and other materials deemed inappropriate under the policy. These regulations exist as part of the Defendants interest in and duty to maintain the security of the prisons. Plaintiff argues that the content of its publications is not detrimental to internal security and therefore should not be censored. However, Plaintiff's challenge to the policy is that it is not rationally related to a legitimate and neutral government interest, *not* that the Plaintiff's materials should not have been rejected under the policy. Plaintiff has not shown that the policy is not rationally related to the legitimate and neutral government interest it simply argues that its own materials should not be excluded under that policy. This does not establish the element necessary to prove Plaintiff's case.

Plaintiff attempts to reach the issue by claiming that the policy as provided is vague or overbroad and therefore unconstitutional. *See,* [Doc. 3 pg. 15]. Plaintiff points to a "non-exhaustive list of seventeen broad categories of reference examples…" *See,* [Doc. 3 pg. 9]. Defendants would argue that a policy which is "non-exhaustive" but nevertheless lays out seventeen (17) reference examples is detailed. Plaintiff argues otherwise and claims that six (6) of these reference examples are too broad and vague and therefore give no notice of the "prohibited conduct." *See, id.* Plaintiff alleges that CD-151201(I)(1)(a) (b) (d) (l) (n) and (q) are too vague and overbroad to provide notice. CD-151201(I)(1)(a) states simply, "Item contains contraband." *See,* Ex. 4 (CD-151201 pg. 7). We assume Plaintiff's confusion to stem from the use of the word contraband in this case as it is not clearly defined on this page. *See, id.* However,

Plaintiff would find the definition of contraband under CD-151200(A)(1) and (2) which provide

the definition of contraband and further break it down into "dangerous contraband" and

"nuisance contraband" each of which is defined using two paragraphs including a paragraph of

examples of each. *See,* Ex. 4 (CD-151200 pg. 1 and 2).

CD-151201(I)(1)(b) states only, "Item facilitates criminal activity." *See,* Ex. 4 (CD-

151201 pg. 7.)  Defendant would argue that this is self-explanatory as any item which could be

utilized in the furtherance of a criminal activity such as assault.

CD-151201(I)(1)(d) clearly states, "Item depicts, describes, or encourages activities

which may lead to the use of physical violence or group disruption." Again, Defendants would

argue that this is a clearly written and easily understood regulation. An item which depicts or

describes a prison riot could arguably lead to a replication at one of these facilities. Music

intended to incent violence against a specific group could lead to physical violence against

persons of that group.

CD-151201(I)(1)(l) reads, "Item contains a pictoral depiction of nudity or a pictoral

depiction of sexual activity, unless the item, taken as a whole is literary, artistic, educational or

scientific in nature." *See,* Ex. 4 (CD-151201 pg. 7-8)*.*  Defendant would also point to CD-

151200(G) and (H) as providing further clarity for this policy as they define both pictoral

depiction of nudity or a pictoral depiction of sexual activity. *See,* Ex. 4 (CD-151200 pg. 2-3). In

the same vein, CD-151201(I)(1)(n) reads, "Item contains written sexually explicit material

which, by its nature or its content, poses a threat to the security, good order, or discipline of the

correctional facility." *See,* Ex. 4 (CD-151201 pg. 8)*.* Defendants argue that CD-151200(H)

provides guidance on those written sexually explicit materials which would pose a threat to

security good order or discipline in the correctional facility including, "conduct involving a

minor, or someone who appears to be under the age of 18, and activity which appears to be non-consensual, forceful, threating or violent." *See,* Ex. 4 (CD-151200 pg. 2-3).

Plaintiff then argues that CD-151201(I)(1)(q) is too vague. CD-151201(I)(1)(q) reads, "Item violates facility rules and regulations." Plaintiff has cited to these rules and regulations throughout its complaint and motion for injunction. Plaintiff admits that it was able to access these rules and regulations during its preparation for filing this case. *See,* [Doc. 3 pgs. 8 - 9] and [Doc. 3-3 ¶2]. The regulations specifically pertaining to Plaintiff's  publication, subscription services, and correspondence, are included in CD-151200 and 151201 to which the Plaintiff cites. Plaintiff has the opportunity to review the current applicable rules and regulations at the NMCD website – from which they have already obtained these policies. *See,* [Doc. 3 pgs. 8 - 9]. As shown above, many of these rules are clearly defined, Plaintiff took issue with only six (6) of the seventeen reference examples provided as discussed above. The remaining eleven (11) example references in the policy were apparently clearly understood by the Plaintiff without assistance.

Defendants have clearly established the rules and regulations including defining those terms which the Plaintiff would argue are vague. To the degree that the example references do not provide clarity or there is a question regarding the artistic nature of a publication, the policy also allows for a publication review board. The question for the Court is not whether the Plaintiff's individual publications should have been censored, but whether the policy is unconstitutional because it is unduly broad and vague as alleged by the Plaintiff. *See,* [Doc. 3 pg. 10]. Although some vagueness is necessary in drafting the policy, hence the example references, the policy is far from indecipherable and clearly provides at least seventeen (17) examples of prohibited materials subject to censorship and includes additional definitions.

Under the *Turner* test, Plaintiff must not merely show that the policy was inappropriately applied in the case of the Plaintiff's materials but must show that the policy itself is not even rationally related to the governments legitimate interest. As stated in *Thornburgh* the government always has a legitimate interest in maintaining order and security in the prisons as it is, "central to all other corrections goals." *See, Thornburgh supra.* Defendant would point out that the portions of the policy which the Plaintiff alleges are vague, are directly related to maintaining security in the facilities, as they address items such as contraband, items which could be used to further criminal activity, and items which could encourage sexual violence or violence against NMCD staff. *See, Ex C (CD-151201(I)(1)(a), (b),(d),(l),(n), and (q)).* Plaintiff cannot establish that these example references are too vague to be understood and therefore applied, and Plaintiff cannot establish that these regulations which directly relate to security in the facilities are not rationally related to a legitimate neutral government interest. Defendants policies are rationally related to a legitimate and neutral government interest, therefore the Plaintiff cannot meet the first element of the *Turner* test and further examination of the other factors is redundant although those factors weigh in favor of the Defendants as well.

## 2. Defendants have provided alternative means of exercising its First Amendment Rights and Plaintiff has not shown that they are unable to provide their publications to incarcerated persons.

Plaintiff alleges that the Defendants have not provided any alternative means of exercising their First Amendment Rights to send correspondence to incarcerated persons. Plaintiff argues, and the Defendants agree, that incarcerated persons have a First Amendment Right to receive in formation and correspondence in prison – within specified limits, "Inmates have a First Amendment right to receive information while in prison to the extent the right is not inconsistent with prisoner status or the legitimate penological objectives of the prison. *Jacklovich*

*v. Simmons*, 420 F.3d 392, 426 (10th Cir. 2004) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).” *See, Prison Leg. News v. Cnty. of Bernalillo*, No. 15 CV 107 JAP/KBM, 2015 WL 13662872, at *7 (D.N.M. June 16, 2015). Defendants also agree that the Plaintiff has a First Amendment right to send its publications to parties who are interested in their opinions and seek out that information, “there is no question that publishers who wish to communicate with those who willingly seek their point of view have a legitimate First Amendment interest in access to prisoners.” *Thornburgh v. Abbott*, 490 U.S. 410, 408 (1987).” *See, Prison Leg. News v. Cnty. of Bernalillo*, No. 15 CV 107 JAP/KBM, 2015 WL 13662872, at *7 (D.N.M. June 16, 2015). The second *Turner* test factor turns on the availability of other methods for the Plaintiff to communicate its materials to incarcerated persons.

In the matter of *Prison Legal News v. County of Bernalillo*, PLN attempted to make the same argument here, asking for a preliminary injunction in response to the alleged unconstitutional mail policies of the Metropolitan Detention Center. Policies which included the alleged censorship and rejection of publications sent by PLN including the PYHS book which is also at issue here. In examining their request, the Court applied the *Turner* tes. The Court found in favor of Defendants and denied the request for injunction finding that the Defendants had sufficiently demonstrated that the mail policy at issue was rationally related to a legitimate neutral penological interest – security and safety – as Defendants have argued above. The Court despite making this determination, chose to briefly address the remaining three factors of the *Turner* test as we do here. The second factor of the test weighs in favor of the Defendants here as well, because the Plaintiff has alternative means of exercising its First Amendment right to communicate its publications to incarcerated persons. Specifically, the *Bernalillo* court found that the Plaintiff may not be able to send its publications directly individual inmates, but that the

Metropolitan Detention Center had a library in its facility at which incarcerated persons could have accessed the materials. Contrary to the MDC policy, the current NMCD policy allows for sending individual incarcerated persons publications within the limitations set forth above. According to the allegations of the Plaintiff, many of its publications are in fact sent and received by the addressees. *See,* [Doc. 3 pg. 8]. As such, despite the Plaintiff's assertions here, the policy does not restrict access to those materials. Additionally, the facilities listed in the Plaintiff's complaint which are administered by the Defendants have libraries where incarcerated persons may access materials donated by third parties. Should the Plaintiff donate its materials, as was suggested to PLN by the *Bernalillo* Court, then the incarcerated person would have access to the material in the prison library and Plaintiff would have vindicated its First Amendment rights.

Although not determinative, and redundant without meeting the first element of the *Turner* test, the facts relevant to the second prong of the *Turner* test weigh in favor of the Defendants, as the policy which is challenged does not unduly interfere with the Plaintiff's right to send correspondence, and because the Plaintiff has alternative means of exercising its first amendment rights.

### 3. Defendant's Mail Policies and Practices Meet the Third and Fourth Prongs of the Turner Standard (Effect on Resources and Feasibility of Alternative Policies).

Plaintiff's claims here that accommodating its First Amendment right here fails because the Plaintiff has yet to show how its first amendment rights were violated and how it would resolve this alleged violation. Plaintiff has so far illustrated not that the Defendants policy is unconstitutional, but only that a small number of its publications were not delivered – and cannot even show that those publications were not sent to the wrong place initially. Plaintiff is unable to state at this time why the materials were not delivered, as no discovery has been conducted, and

instead makes a bald assertion that Defendant's are censoring its publications without any proper investigation. As noted above, the Plaintiff has already illustrated that its records are incorrect in the case of Michael Aragon who Plaintiff believed was incarcerated LCCF when he was really housed at SNMCF. Plaintiff now asks the Court to agree to a mandatory injunction based on a its simple claims that because the returned envelope did not provide a reason for its return it must be censorship.

In its claim here, the Plaintiff seeks to minimize the amount of time and resources which are spent sorting and processing correspondence. Plaintiff cites to a number of cases which state regulations designed to reduce the volume of incoming mail were arbitrary and unconstitutional. *See,* [Doc. 3 pg. 18]. However, those cases are distinguished from the current case because the issue here is not related to the volume of incoming mail, but rather the alleged censorship of a very small percentage of Plaintiff's publications. The correspondence policies in place under NMCD are intended to provide access while maintaining the safety and security of the facilities under their care. Plaintiff would like to inflate this issue to seem as if there was a policy of denying its publications to incarcerated persons, but this is simply not true as evidenced by Plaintiff's own allegations that a number of inmates within New Mexico corrections are still receiving their publications without issue. As discussed above, Plaintiff's issue is not with a policy promulgated by the Defendants its simply with its application in this small percentage of circumstances.  Defendants already allocate the resources to accommodate the Plaintiff's First Amendment right to send its publications to incarcerated persons.

Plaintiff claims, without providing examples or suggestions, that there are alternative policies which are less restrictive which the Defendants could implement in order to allow for Plaintiff to send their publications to incarcerated persons. Rather than name any of theses

alternatives, the Plaintiff instead argues that the fact that they are able to deliver thousands of their publications to incarcerated person nationwide without creating penological problems "highlight the ready alternatives to Defendant's censorship are available." Plaintiff seems to ignore that it *DOES* send its publications to incarcerated persons in New Mexico and in fact many of those publications are appropriately delivered without creating a problem. If the Defendants had banned all publications the Plaintiff might have a fight, but there is no ban on Plaintiff's publications, there are simply reasonable rules and regulations which the Plaintiff is required to follow to preserve the safety of the inmates.

Ultimately, Plaintiff does not have standing to bring a First Amendment claim unless it can craft an issue of censorship for this Court. Plaintiff is desperate to turn a few returned mail items into a cause and is attempting to fast track an injunction on weak evidence for that purpose. Defendants' policies are clearly rationally related to a legitimate and neutral government interest, and they allow for the Plaintiff to exercise its First Amendment rights in the most reasonable manner possible. Plaintiff cannot provide alternatives for the policy because they know that the policy is in fact constitutional and they know that their publications still reach a majority of inmates in NMCD who they are sent to. The Plaintiff does not wish this case to move into discovery without the injunction, because it is aware that the case will fall apart on close scrutiny of each individual item claimed to have been inappropriately returned, and that the investigation will not reveal a pattern or practice stemming from the Defendants policies which is unconstitutional.

      **b.**    **Plaintiff's Fourteenth Amendment claim cannot stand because Plaintiff has not established that there was a deprivation of a protected interest.**

Plaintiff cannot maintain its claim under the Fourteenth Amendment because it has not established that there was a deprivation of a protected interest. In order to succeed on a

Fourteenth Amendment claim for violation of due process, the Plaintiff, "must first show a deprivation of a protected interest in life, liberty, or property. The Supreme Court has recognized that publishers have a constitutional right to communicate with prisoners *to the extent that it does not interfere with a prison's legitimate penological interests. See Thornburgh,* 490 U.S. at 407, 109 S.Ct. 1874. *After* showing a deprivation of a protected interest, a plaintiff must then show that the interest was deprived without constitutionally adequate process. *Zinermon v. Burch,* 494 U.S. 113, 125–26, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990)." (emphasis added) *See, Human Rights Def. Ctr. v. Bd. of Cnty. Commissioners for Strafford Cnty., New Hampshire,* 654 F. Supp. 3d 85, 100 (D.N.H. 2023). As shown above, the Plaintiff in this matter has not shown that it has been deprived of a protected interest (communication), because it cannot succeed on its First Amendment claim.

New Mexico courts have already had the opportunity to address the issue of a Fourteenth Amendment claim paired with a First Amendment claim when it comes to censorship in the corrections system. The above cited matter of *Prison Legal News v. County of Bernalillo, et. al.;*2015 WL 13662872 (D.N.M. Jun 16, 2015) deals with the same claims which were made here. In *PLN v. C'nty of Bernalillo* copies of the PYHS which Plaintiff distributes were allegedly censored by the Metropolitan Detention Center based on a policy Plaintiff claimed was unconstitutional. In that case the policy dealt with a complete ban on all books being sent to incarcerated persons at the facility. The United States District Court of New Mexico applied the *Turner* test used above to the allegedly unconstitutional policy and found as in this case, that the policy was rationally related to the legitimate and neutral government interest of security and safety in the corrections facility. As such, the *Bernalillo* court determined that the policy passed the *Turner* test and it was not unconstitutional to deny incarcerated person access to books in the

interest of security, safety, and storage. The *Bernalillo* court also determined that because there was no injunction issuing from the First Amendment claim there were no grounds for the MDC to gain relief under the Fourteenth Amendment claim for violations of due process as the right had not been infringed upon, "Since no injunction will issue on the general prohibition of books being sent to individual inmates through the mail, a procedure for individual rejections is unnecessary." *See, Prison Leg. News v. Cnty. of Bernalillo*, No. 15 CV 107 JAP/KBM, 2015 WL 13662872, at *13 (D.N.M. June 16, 2015). Because the *Bernalillo* court determined that there was no unconstitutional deprivation of a protected interest in the first place, there was no reason to determine if the alleged deprivation included a constitutionally adequate process.

Because Plaintiff cannot establish that it was unconstitutionally deprived of a protected interest, it cannot make a claim that it was not afforded due process in the deprivation, and therefore cannot maintain its claim under of Fourteenth Amendment violations.

## II.    PLAINTIFF HAS NOT SHOWN THAT IT IS SUFFERING IRREPARABLE HARM AND HAS NOT SHOWN THAT AN INJUNCTION IS NECESSARY.

Plaintiff has failed to illustrate the irreparable harm it claims it will suffer if a preliminary injunction is not granted because it has not demonstrated that Defendants have prevented the distribution of its materials, it has not shown that there are no other reasonable alternatives to deliver its materials, and it has not shown that any harm will result from the alleged lack of notification.

"Irreparable harm is a 'necessary threshold showing for awarding preliminary injunctive relief.' *Matos ex rel. Matos v. Clinton School Dist.*, 367 F.3d 68, 73 (1st Cir. 2004). The plaintiff must show that absent a court injunction, it is 'likely to suffer irreparable harm before a decision on the merits can be rendered.' *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*,

645 F.3d 26, 32 (1st Cir. 2011)." *See, Human Rights Def. Ctr. v. Bd. of Cnty. Commissioners for Strafford Cnty., New Hampshire,* 654 F. Supp. 3d 85, 102 (D.N.H. 2023). The "showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *DTC Energy Grp., Inc. v. Hirschfeld,* 912 F.3d 1263, 1270 (10th Cir. 2018). "Demonstrating irreparable harm is not an easy burden to fulfill" as "[t]he purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without [its] issuance" (quotations omitted)). *Id.*

The mere allegation that a due process right was denied is insufficient to trigger a finding of irreparable harm to the Plaintiff. *See, Pub. Serv. Co. of New Hampshire v. Town of W. Newbury,* 835 F.2d 380 (1st Cir. 1987).  A finding of irreparable harm must be grounded in sufficient evidence that harm will result from the lack of an injunction, "Further, '[a] finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store.' *Charlesbank Equity Fund II, Ltd. P'ship v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004)." *See, Human Rights Def. Ctr. v. Bd. of Cnty. Commissioners for Strafford Cnty., New Hampshire,* 654 F. Supp. 3d 85, 102 (D.N.H. 2023).

The Defendants would ask the Court to take judicial notice of the timeline of the request for preliminary injunction based on the claim of irreparable harm. "As a general proposition, delay in seeking preliminary relief cuts against finding irreparable injury." *Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1543-44 (10th Cir. 1994). Plaintiff alleges that it has known for approximately two and a half years that its publications were being "censored" by NMCD. *See,* [Doc. 3 pg. 2].  Despite claiming to have knowledge of the alleged "censorship" beginning in February 2022, the request for a preliminary injunction

was not made until October 2024 when the present lawsuit was filed. *See,* [Doc. 3]. Plaintiff's

claim of irreparable harm is severely undercut by the delay in seeking preliminary relief for more

than two (2) years. Rather than seek relief for the claimed irreparable injury, the Plaintiff settled

for sending one (1) letter a year to the Defendants, inquiring about the alleged censorship. *See,*

[Doc. 3 pg. 2 and 10] and [Doc. 3-2 ¶41 - 43 and Exs. E & F].

 Plaintiff claims that it will be irreparably harmed because it will not be able to

communicate with incarcerated persons and distribute its materials to them are unfounded, as the

Plaintiff still has the ability to send its publications and materials to incarcerated persons in

NMCD. Plaintiff has alleged that it still sends publications and materials to thousands of

incarcerated persons within the NMCD without those materials being censored. *See,* [Doc. 3 pg.

8]. Easily accessible public records show that NMCD housed more than five - thousand people in

2023 alone. The Plaintiff's time frame for the alleged censorship is approaching three (3) years at

this point, further growing the number of people housed by NMCD. The fraction of materials

which were not delivered in this time and of which Plaintiff complains, are hardly illustrative of

irreparable harm to its ability to communicate with incarcerated persons, as it continues to do

with thousands of others within NMCD. Further Plaintiff's own exhibits show that it is

communicating with people within NMCD of its own and has been able to correspond with

persons whose other publications were allegedly censored. *See,* [Doc. 3-2 ¶21 – 23 and Ex. G].

Plaintiff is also allowed to provide copies of its materials to the various libraries within NMCD

which provide access to publications for incarcerated persons. Plaintiff has not made a showing

that it has been foreclosed from providing its publications in this manner by NMCD and as

shown above, NMCD has even extended this offer to the Plaintiff as early as July 28, 2023. *See,*

Ex. 2. Additionally, the Plaintiff has not shown that it cannot provide digital versions of its

publications to subscribers using either the computer resources available at the facilities or via the new "Smart Communications" tablets.

Finally, the Plaintiff's claim of irreparable harm is unfounded, because the Plaintiff is aware of the policies under which its publications may be refused and therefore has notice of the potential refusal of its materials. There is no requirement that notice is given for every individual item, when the policy is available and establishes notice, "Here, HRDC has not shown that it will suffer irreparable harm in the absence of a preliminary injunction. The record shows that HRDC has notice of the current policy and how it is applied. Thus, it will not suffer harm if the Jail does not send it a letter explaining the policy every time it rejects HRDC's mailings in the future. See Larkin, 2020 WL 981289, at *29." *See, Human Rights Def. Ctr. v. Bd. of Cnty. Commissioners for Strafford Cnty., New Hampshire*, 654 F. Supp. 3d 85, 102–03 (D.N.H. 2023). Plaintiff HRDC has established in its Complaint and present motion that it has access to the NMCD correspondence policy and at least seventeen (17) reference examples which provide guidance on why a publication may be rejected. Plaintiff therefore has notice of why its mailings would be rejected and Defendants are not required to provide individual notice for each allegedly refused item. Further, Plaintiff was provided the grievance policy on or about July 28, 2023 so that it may make a formal grievance, which it has apparently chosen not to doe.

Plaintiff cannot make claims of irreparable harm to its ability to communicate when it is actively communicating. The alleged censorship of Plaintiff's publications over a nearly three (3) year period is insufficient to establish that irreparable harm will result, when the Plaintiff is still able to communicate inmates in the same manner, and has other alternative methods of providing its publications to the incarcerated population.

### III.    THE BALANCE OF EQUITITES DOES NOT FAVOR THE MANDATORY INJUNCTION REQUESTED

The balance of equities does not favor the preliminary injunction requested by the Plaintiffs. In essence the Plaintiff is asking for a mandatory and unspecified form of injunction to prevent an alleged irreparable harm. Plaintiff's argument hinges wholly on the claim that it will suffer irreparable harm. As argued above the Plaintiff would not in fact suffer irreparable harm, and is not currently suffering the alleged harm. Plaintiff contradicts its own claims here alleging now that there is a total ban on its ability to communicate with persons incarcerated within NMCD, "HRDC is blocked from distributing its publications and correspondence to incarcerated persons in Defendants' custody, and without an injunction, Defendants will continue to censor HRDC's communications without due process, banning its core protected speech." *See,* [Doc. 3 pg. 24]. This is contradicted by Plaintiff's earlier assertion that it is still able to deliver its publications to thousands of other inmates. *See,* [Doc. 3 pg. 24]. Plaintiff seeks to exaggerate the alleged harm done here, prior to any discovery being conducted, in order to obtain a preliminary injunction.

Plaintiff also seeks to minimize the cost of the injunction it seeks simply stating (without any factual basis) that potential injuries to Defendants are "minimal and speculative. No great cost or expenditure of time is required to deliver HRDC's mailings to incarcerated persons and provide constitutionally mandated due process, as already happens in correctional facilities across the country." *See,* [Doc. 3 pg. 24]. However, Plaintiff's requested injunction would require a re-write of NMCD policy in order to provide the allegedly required individual notice to the publisher. Because individual notice to the publisher is not constitutionally required where the publisher has access to the policy, as shown above, the Defendants would have to create an entirely new policy and procedure out of thin air. This would take a significant amount of time

and effort and would require the Defendants to engage policy experts and conduct policy research. Defendants would be required to distribute, train, and integrate this new correspondence policy across its facilities and would need to hire additional staff, or expend additional time and money on currently existing staff, to accomplish these tasks.

Despite Plaintiff's bald assertions the balance of equities heavily favors the Defendants as Plaintiff will not suffer an irreparable harm and Defendant would have to expend significant time and money to implement this individualized notice policy.

## IV.    GRANTING A PRELIMINARY INJUNCITON DOES NOT SERVE THE PUBLIC INTEREST

A preliminary injunction in this case does not serve the public interest. Granting the injunction would increase the burden on the public purse and would bypass the appropriate systems established by the legislature for determining policy. The injunction does not serve the public so much as it serves Plaintiff's personal interest as there has been no showing that the Plaintiff has been deprived of any right s or will suffer irreparable harm without it. The injunction would disrupt the system set in place by NMCD for the inspection and delivery of mail. More importantly, granting the injunction would undermine the Court's stated purpose in granting substantial deference to the professional judgment of prison officials to keep their facilities safe and secure, "Despite the weakness of the fire and storage concerns, the Court, at this juncture, is especially mindful of the need to afford 'deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world.' *Thornburgh,* 490 U.S. at 407–08." *See, Prison Leg. News v. Cnty. of Bernalillo,* No. 15 CV 107 JAP/KBM, 2015 WL 13662872, at *12 (D.N.M. June 16, 2015)

**CONCLUSION**

24

As shown above, Plaintiff's claims are unlikely to succeed on the merits, as they cannot establish that they have been deprived of their First Amendment rights by the Defendants policy. Plaintiff cannot establish that the policy unconstitutional because it is vague and cannot establish that it is not rationally related to a legitimate neutral government interest. Plaintiff is unlikely to succeed on its First Amendment claim. Absent the deprivation of a protected interest the Plaintiff cannot maintain its Fourteenth Amendment violation claims. As such there are no grounds on which to establish the injunction requested by the Plaintiff and it would not be equitable or in the public's interest to grant the injunction.

WHEREFORE the Defendants respectfully request that the Court enter an Order denying Plaintiff's Motion for Preliminary Injunction, and awarding any other such relief the Court deems just and proper.

Respectfully submitted,

**CARRILLO LAW FIRM, P.C.**

*/s/ Raúl A. Carrillo, Jr.*
Raúl A. Carrillo, Jr., Bar No. 5600
P.O. Box 457
Las Cruces, NM 88004
(575) 647-3200
(575) 647-1436 (fax)
raul@carrillolaw.org
*Attorneys for State Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on the 20th of December, 2024, a copy of the foregoing document was sent via the federal CM/ECF filing system to the following:

ROSEN BIEN GALVAN & GRUNFELD, LLP
Ernest Galvan, Cal Bar No. 196065
Marc. J. Shinn-Krantz, Cal. Bar No. 312968
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
(415) 433-6830
(415) 433-7104 (fax)

HUMAN RIGHTS DEFENSE CENTER
Jonathan P. Picard, Fla. Bar No. 105477
P.O. Box 1151
Lake Worth, Florida 33460
(561) 360-2523
(561) 828-8166 (fax)

IVES & FLORES, P.A.
Laura Schauer Ives, SB#12463
Adam C. Flores, SB #146686
925 Luna Circle NW
Albuquerque, NM 87102
(505) 364-3858
(505) 364-3050 (fax)

*/s/ Raúl A. Carrillo, Jr.*
Raúl A. Carrillo, Jr.