## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

**HUMAN RIGHTS DEFENSE CENTER,**

      Plaintiff,

**vs.**

**MICHELLE LUJAN GRISHAM**, individually and in her capacity as Governor of the State of New Mexico; **ALISHA TAFOYA LUCERO**, individually and in her capacity as Cabinet Secretary of the New Mexico Corrections Department; **MELANIE MARTINEZ**, individually and in her capacity as Deputy Secretary of the New Mexico Correction Department; **GARY MACIEL**, individually and in his capacity as Deputy Secretary of the New Mexico Correction Department; **BRIAN R. EVANS**, individually and in his capacity as Chief Executive Officer of The GEO Group, Inc.; **WAYNE H. CALABRESE**, individually and in his capacity as President and Chief Operating Officer of The GEO Group, Inc.; **THE GEO GROUP, INC. d/b/a LEA COUNTY CORRECTIONAL FACILITY**, a corporation; **SCOTT MARQUARDT,** individually and in his capacity as Chief Executive Officer of Management & Training Corporation; **DANIEL MARQUARDT**, individually and in his capacity as President of Management & Training Corporation**; MANAGEMENT & TRAINING CORPORATION d/b/a OTERO COUNTY PRISON FACILITY**, a corporation**; JOHN AND JANE DOES 1-20**, individually and in their official capacities; and **ENTITIES 1-10**,

      Defendants.

No. 1:24-cv-01091-SMD-KRS

## PLAINTIFF'S SECOND MOTION FOR PRELIMINARY INJUNCTION; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Plaintiff Human Rights Defense Center ("Plaintiff' or "HRDC"), pursuant to Federal Rule of Civil Procedure 65(a), hereby respectfully moves this Court to issue a preliminary injunction enjoining Defendants Management & Training Corporation ("MTC") d/b/a Otero County Prison Facility, Scott Marquardt, and Daniel Marquardt (collectively, "MTC Defendants") from implementing unconstitutional mail policies and practices and refusing to deliver HRDC's publications to incarcerated persons in custody at Otero County Prison Facility ("OCPF"), in violation of Plaintiff's rights to free speech and due process under the First and Fourteenth Amendments to the Constitution of the United States.

Plaintiff previously filed a Motion for Preliminary Injunction ("First PI Motion") in October 2024 seeking a preliminary injunction against ongoing violations of its constitutional rights by Defendants Michelle Lujan Grisham, Alisha Tafoya Lucero, Melanie Martinez, Gary Maciel, Brian R. Evans, Wayne H. Calabrese, The GEO Group, Inc. d/b/a Lea County Correctional Facility (collectively, "Original Defendants").  ECF No. 3.  Plaintiff files this Second Motion for Preliminary Injunction ("Second PI Motion") to seek preliminary injunctive relief against the MTC Defendants, who only recently became parties to this case through the First Amended Complaint.  ECF No. 76.

This Second PI Motion is based on the memorandum of points and authorities below, the Declaration of Paul Wright ("Second Wright Decl.") and the Declaration of Brenda Muñoz ("Muñoz Decl.") in Support of Plaintiff's Second Motion for Preliminary Injunction filed herewith, the pleadings in the above-captioned matter, and any oral argument or evidence permitted at any hearings on this motion.  Plaintiff requests a hearing on this motion.

//

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

On October 25, 2024, Plaintiff filed the First PI Motion concurrently with its Complaint to enjoin the Original Defendants from unconstitutionally censoring HRDC's books, magazines and correspondence mailed to incarcerated persons at New Mexico Corrections Department ("NMCD") prison facilities, and from failing to provide due process to challenge these censorship decisions.  ECF No. 3.  Since then, Plaintiff has identified hundreds of newly-discovered instances of unlawful censorship of HRDC's materials, including censorship at OCPF, a prison facility housing NMCD incarcerated persons but privately operated by the MTC Defendants.  Beginning in April 2025, the MTC Defendants have engaged in at least one hundred sixty (160) instances of unlawful suppression of HRDC's speech without due process, by refusing to deliver books and magazines mailed by HRDC to persons incarcerated at OCPF.

Like the Original Defendants, the MTC Defendants' current written mail policies and procedures are unconstitutional on their face and as applied to HRDC.  As the censorship is not rationally related to any legitimate penological interest, and HRDC's free speech rights are being infringed without due process, Plaintiff's likelihood of success on the merits is great.  The violations of HRDC's constitutional rights are causing irreparable harm, and the balance of hardships and public interest tips sharply in Plaintiff's favor.  A preliminary injunction therefore should be granted.

Counsel for the MTC Defendants oppose this Second PI Motion.  *See* Muñoz Decl. ¶ 6, Ex. E.

## FACTUAL BACKGROUND

### A.    HRDC's Publications.

HRDC is a not-for-profit charitable organization under Section 501(c)(3) of the Internal

Revenue Code. *See* Declaration of Paul Wright in Support of Plaintiff's Motion for Preliminary Injunction ("First Wright Decl."), ECF No. 3-2, ¶ 2. For over thirty-five years, HRDC's mission has focused in part on helping incarcerated persons to educate themselves about their constitutional and human rights and to learn about accessing education. *Id.* HRDC accomplishes this through several means, most notably through the publication and distribution of books, magazines, and other information about correctional facilities and the rights of incarcerated persons. *Id.* HRDC publishes and distributes two monthly soft-cover magazines: *Prison Legal News*, an award-winning monthly magazine which contains news and analysis about the conditions and management of correctional facilities, the rights of incarcerated persons, and other matters of interest to incarcerated persons; and *Criminal Legal News*, which contains news and analysis about individual rights, court rulings, and other criminal legal-related issues. *Id.* ¶¶ 3-5, 7.

HRDC also publishes and/or distributes several different soft-cover books on criminal justice, health, and legal issues that are of interest to incarcerated persons and others. *Id.* ¶ 7. Three of these are pertinent to this motion. First, HRDC is the sole national distributor of *Protecting Your Health and Safety* ("PYHS"), which describes the rights, protections and legal remedies available to persons concerning their health and safety while they are incarcerated. Second Wright Decl. ¶¶ 4, 17, Ex. E. Second, HRDC publishes and distributes *Prisoners' Guerilla Handbook: A Guide to Correspondence Programs in the United States and Canada* ("*Prisoners' Handbook*"), which provides incarcerated persons information on enrolling at accredited higher educational, vocational and training schools. *See id.* ¶¶ 4, 15, Ex. C. Third, HRDC publishes and distributes *The Habeas Citebook: Ineffective Assistance of Counsel* ("*Habeas Citebook*"), which describes the procedural and substantive complexities of federal

habeas corpus litigation with the goal of identifying and litigating claims involving ineffective assistance of counsel.  *Id.* ¶¶ 4, 16, Ex. D.

Since its creation in 1990, HRDC has sent its publications and books to incarcerated persons and law librarians in more than 3,000 correctional facilities across the United States, including at death row housing units and "supermax" prisons.  First Wright Decl. ¶ 12.  The publications and books that HRDC distributes have been mailed to hundreds of persons incarcerated in New Mexico, including in the NMCD state-operated facilities, as well as, *inter alia*, in the Rio Arriba County Jail, Metropolitan Detention Center in Bernalillo County, San Miguel County Detention Center, FCI La Tuna operated by the US Bureau of Prisons, and the Cibola County Detention Center housing U.S. Immigration and Customs Enforcement ("ICE") detainees.  *Id.*

**B.    The MTC Defendants' Unconstitutional Mail and Book Policies and Practices.**

NMCD's publicly available policies and procedures regarding incoming mail for incarcerated persons ("Mail Policy") (last revised May 27, 2025) states that its "Applicability" extends to all "New Mexico Corrections Department (NMCD) employees and inmates."  *See* Muñoz Decl. ¶ 2, Ex. A at 1.  The NMCD Mail Policy appears to allow incarcerated persons to receive publications directly from an approved publisher or vendor.  *Id.* at 6 (Policy CD-151201, Procedures § C.1. ("Inmates will be allowed to receive publications when received directly from approved vendors, pursuant to specified criteria described in rejection of mail procedures below.")); *id.* at 8 (Policy CD-151201, Procedures § I.1. ("Mail … and publications will be rejected if they are detrimental to internal security of the institution or other legitimate penological interests."))  The local mail policy for OCPF also appears to allow incarcerated persons to receive publications in the mail, subject to certain content-based grounds for rejection.

*Id.* ¶ 4, Ex. C at MTC_HRDC_00009 (Inmate Mail and Correspondence, Procedures § G ("Incoming and outgoing general correspondence and other mail may be rejected by the Warden or designee to protect the security, good order, or discipline of the institution; to protect the public; or to deter criminal activity."). However, the individual MTC Defendants filed affidavits in this case stating that they are "contractually obligated to adhere to NMCD's policies and procedures, including its policies and procedures governing inmate correspondence and mail." ECF No. 93, Ex. A ¶ 11, Ex. B ¶ 11.

On December 29, 2021, NMCD issued a memorandum announcing that beginning February 1, 2022, "personal mail will no longer be accepted at state-run prison facilities," and should instead be mailed to NMCD's digitization vendor in Florida, Securus Technologies, but that the two privately-operated prisons, including OCPF, "will continue to accept personal mail." Declaration of Marc J. Shinn-Krantz in Support of Plaintiffs' Motion for Preliminary Injunction ("Shinn-Krantz Decl."), ECF No. 3-1, ¶ 5, Ex. A.[1] The memorandum does not define "personal mail" or announce any changes about how publications mailed by a publisher or distributor will be treated. *Id.* The memorandum also provides that "[a]t all private and state-run facilities moving forward, mail will no longer be accepted that is comprised of cardboard or other rigid parchment incapable of running through the scanner. For example, USPS postal rigid express envelopes that lay flat but do not bend without creasing would not be accepted and magazines will not be accepted." *Id.* None of the changes to NMCD's mail policies described in this memorandum were reflected in NMCD's public Mail Policy until the most recent May 27, 2025

---

[1] In June 2024, NMCD launched the use of "Smart Communications" tablets at all state-operated facilities, with privately contracted locations to follow shortly afterwards. *See* Muñoz Decl. ¶ 5, Ex. D. It instructed families and friends of incarcerated individuals to send direct mail to its new digitization vendor, Smart Communications Holding, Inc. ("Smart Communications") at a P.O. Box address in Seminole, Florida. *Id.*

version (which, as noted above, still does not purport to ban magazines or other publications).

*Compare* Muñoz Decl. ¶ 2, Ex. A at 3 (Policy CD-151200, Policy §§ A. & B. (all incoming mail (other than "legal mail and privileged correspondence") "must be sent to the designated centralized address," and "[c]orrespondence sent directly to facilities will be returned to sender")) *with id.* ¶ 3, Ex. B at D00002-D00003 (Policy CD-151200, Policy §§ A. & B.).

Beginning in February 2022, after receiving complaints from incarcerated persons that its materials were being censored by NMCD, HRDC sent outreach letters, magazines, books, and other correspondence to subscribers and potential subscribers at NMCD prison facilities in order to investigate the claims that HRDC's materials were not being allowed in the prisons. Second Wright Decl. ¶ 4. Soon after, HRDC began to receive back hundreds of publications and correspondence via the Return to Sender service of the United States Postal Service ("USPS") at Plaintiff's expense, which were rejected and not delivered to their intended recipients at NMCD. *Id.* ¶ 5-6. Starting in April 2025, well after Plaintiff first initiated the current lawsuit, the returned items of mail began to include HRDC publications rejected from OCPF by the MTC Defendants. *Id.* ¶ 7. HRDC has identified at least one hundred and sixty (160) instances where items of mail sent to incarcerated persons at OCPF were censored by the MTC Defendants, including at least (45) forty-five issues of *Prison Legal News*, forty-four (44) issues *of Criminal Legal News*, twenty-seven (27) copies of the book *PYHS*, twenty-two (22) copies of *Prisoners' Handbook*, and twenty-two (22) copies of *The Habeas Citebook*. *Id.* ¶¶ 7-8, Ex. A.[2] In each case, HRDC's staff confirmed that the intended recipient was still incarcerated at OCPF at the

---

[2] **Exhibit A** to the Second Wright Declaration contains spreadsheets of information kept in the normal course of business by HRDC showing all mail that was returned by the MTC Defendants that was intended for incarcerated persons who were still in custody at OCPF at the time HRDC received the return from April 2025 to July 2025. Second Wright Decl. ¶ 7. **Exhibit B** to the Second Wright Declaration contains true and correct electronic copies of the front page or mailing envelope of each of the censored and returned items. *Id.*

time the mailing was returned to HRDC.  *Id.* ¶ 7.

All of the rejected items of mail contained an ink stamp, label, or handwritten notation containing the words "REFUSED," "RETURN TO SENDER" or "RTS."  *Id.* ¶ 9, Ex. B.  Of the one hundred and sixty (160) instances of rejected mail, one hundred and thirty-two (132) also contained either handwritten notations containing the words "Not Approved" or "Not Allowed," or an ink stamp containing the words "NO BOOKS, MAGAZINES, OR NEWSPAPERS."  *Id.* ¶¶ 10-11, Ex. B.  In addition, several of the rejected magazines and publications included instructions to mail them to the incarcerated person in the care of ("c/o") NMCD's mail digitization vendor, Smart Communications, in Florida, even though OCPF was exempted from the NMCD memorandum requiring that all "personal mail" be sent there.  *Id.* ¶¶ 9, 11-12, Ex. B. When HRDC mailed the rejected publications there, however, they were once again returned.  *Id.*

The NMCD Mail Policy, as well as the MTC Defendants' actual practices implementing that policy at OCPF, are unconstitutional on their face and as applied.  The grounds for rejecting mail are too broad and vague for a sender to understand what is prohibited.  *See* Muñoz Decl. ¶ 2, Ex. A at 8-9 (Policy CD-151201, Procedures § I).  The NMCD Mail Policy provides that "publications will be rejected if they are detrimental to internal security of the institution or other legitimate penological interests" and includes a non-exhaustive list of seventeen categories of reference examples, some of which are so broad and vague as to give no notice of the prohibited conduct.  *See, e.g., id.* ("Item contains contraband," "Item facilitates criminal activity," "Item depicts, describes, or encourages activities which may lead to the use of physical violence or group disruption," and "Item violates facility rules and regulations.")  These categories are open to a wide interpretation that invites censorship of materials, including HRDC's publications, for which there is no legitimate penological reason to restrict access.  *See* Declaration of John L.

Clark in Support of Plaintiff's Motion for Preliminary Injunction ("Clark Decl."), ECF No. 3-3,
¶ 53.  Indeed, HRDC has distributed over one million copies of its magazines and has been
mailing publications to incarcerated persons at thousands of jails and prisons for decades,
without ever causing a security incident.  First Wright Decl. ¶¶ 2, 11-12, 20.

     The NMCD Mail Policy also does not provide any requirement for notice of censorship
to the senders of publications, as is common in other correctional settings.  Clark Decl. ¶¶ 54-55.
Although the Mail Policy requires written notice to both the incarcerated person and the sender
for rejected "mail items, enclosures, or packages," Muñoz Decl. ¶ 2, Ex. A at 9 (Policy CD-
151201, Procedures § I.7), the separate process for the rejection of publications requires notice
only to the intended recipient and not the sender, *id.* at 10 (Policy CD-151201, Procedures
§ I.11).  The Mail Policy does not provide for any appeals process for a sender to challenge a
censorship decision.  Clark Decl. ¶ 54; First Wright Decl. ¶ 45; Muñoz Decl. ¶ 2, Ex. A.

     Other than the markings, ink stamps, and labels on the items of mail returned to HRDC
by the MTC Defendants via the USPS Return to Sender service, HRDC never received any
notification that its mailings had been rejected.  Second Wright Decl. ¶ 18.  The MTC
Defendants provided no notice of a right to challenge the censorship, nor did HRDC receive any
information about how it could appeal the rejection of the items of mail.  *Id.*  And at no time did
anyone from OCPF contact HRDC to alert it to any particular security concern.  *Id.*

     By their adoption and application of NMCD's mail policies and practices at OCPF, the
MTC Defendants are impermissibly interfering with protected expressive activities and chilling
future speech from HRDC and others.  The MTC Defendants' current policies and practices,
unless enjoined, will continue to violate HRDC's constitutional rights, causing irreparable harm.

## **LEGAL STANDARD**

     A preliminary injunction is appropriate where a plaintiff demonstrates "[1] that he is

likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Tenth Circuit precedent favors granting preliminary injunctions to a plaintiff who is likely to succeed on the merits of its First Amendment Claim because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *See Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1263 (10th Cir. 2016) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1975)); *see also Planned Parenthood*, 828 F.3d at 1251, 1266 (directing the district court to grant preliminary injunction against the state government in § 1983 claim alleging government violated organization's First Amendment and Fourteenth Amendment rights); *Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243, 1254 (10th Cir. 2024) (affirming preliminary injunction against government school district in § 1983 First Amendment free speech clause action).

## ARGUMENT

### I.    HRDC IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.

#### A.    The MTC Defendants Are Violating HRDC's First Amendment Right to Communicate with Incarcerated Persons.

The MTC Defendants' policies and practices violate settled law on the First Amendment rights of publishers.  Courts have long held that publishers and incarcerated persons have First Amendment rights to communicate with each other, subject only to limitations required by legitimate security concerns.  "[T]here is no question that publishers who wish to communicate with those who … willingly seek their point of view have a legitimate First Amendment interest in access to prisoners." *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989).  "[C]ensorship of prisoner mail works a consequential restriction on the First and Fourteenth Amendments rights

of those who are not prisoners." *Procunier v. Martinez*, 416 U.S. 396, 409 (1974) ("*Martinez*"), *overruled in part on other grounds by Thornburgh*, 490 U.S. at 411-14. "Whatever the status of a prisoner's claim to uncensored correspondence with an outsider, it is plain that the latter's interest is grounded in the First Amendment's guarantee of freedom of speech." *Id.* at 408.

HRDC's speech covers topics of great public concern and therefore "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation marks omitted); *see also Pell v. Procunier*, 417 U.S. 817, 830 n.7 (1974) ("[T]he conditions in this Nation's prisons are a matter that is both newsworthy and of great public importance."). The Tenth Circuit has held that "[HRDC, previously known as] PLN has a First Amendment interest in providing its magazine to inmates who subscribe to it." *Jones v. Salt Lake Cnty.*, 503 F.3d 1147, 1162 (10th Cir. 2007); *see also Prison Legal News v. Cook*, 238 F.3d 1145, 1149 (9th Cir. 2001) (speech contained in *Prison Legal News* is core protected speech).

To withstand First Amendment scrutiny, prison policy must be "reasonably related to legitimate penological interests," and must not be an "exaggerated response" to any alleged security concerns. *Turner v. Safley*, 482 U.S. 78, 89-91 (1987). This inquiry turns on four factors:

> (1) whether the regulation is rationally related to a legitimate and neutral governmental objective; (2) whether there are alternative avenues that remain open to the inmates to exercise the right; (3) the impact that accommodating the asserted right will have on other guards and prisoners, and on the allocation of prison resources; and (4) whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials.

*Cook*, 238 F.3d at 1149 (citing *Turner*, 482 U.S. at 89-90). While respectful of correctional officials' expertise, *Turner*'s "reasonableness standard is not toothless." *Thornburgh*, 490 U.S. at 414 (internal quotation marks omitted). HRDC is highly likely to prevail on each of the

*Turner* factors.[3]

### 1.    The MTC Defendants' Mail Policies And Practices Are Not Rationally Related To Any Legitimate Penological Objectives.

The first *Turner* factor looks to whether there is "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89.  Under this prong, "a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Id.* at 89-90.  "The legitimate governmental objective must also be neutral … [and] operate without regard to the content of the expression.  Where a regulation furthers an important or substantial government interest unrelated to the suppression of expression, the neutrality requirement is met." *Jones*, 503 F.3d at 1153 (internal citations omitted).

Here, there is no "valid, rational connection" between the MTC Defendants' de facto total ban on publications and any legitimate governmental interest. *Turner*, 482 U.S. at 89.  The MTC Defendants rejected HRDC's mailings because "books, magazines, or newspapers" are not approved or allowed into OCPF, *see* Second Wright Decl. ¶¶ 10-11, Ex. B, per NMCD's Mail Policy and December 2021 memorandum, which require that all non-legal mail be sent directly to Smart Communications in Florida and provide that mail incapable of being run through a scanner will not be accepted.  Muñoz Decl. ¶ 2, Ex. A at 3; Shinn-Krantz Decl., ECF No. 3-1, ¶ 5, Ex. A.  It has become increasingly common for prison and jail systems to require that personal correspondence such as letters and cards be processed off-site as a way to limit the introduction of contraband.  Clark Decl. ¶¶ 56-57.  Public statements by NMCD spokespersons suggest that the recent mail policy changes have been driven by similar security concerns.  *Id.*

---

[3] While this case involves HRDC's free speech rights (and not the rights of incarcerated persons), for purposes of this motion, HRDC assumes the Court will apply the *Turner* test to ensure that injunctive relief employs due deference to prison operations.

¶ 62. But NMCD and the MTC Defendants have expanded this restriction beyond the legitimate concern of preventing contraband in personal letters to prohibit the delivery to incarcerated persons of **_any_** books, magazines, or other publications, even when sent directly by a publisher like HRDC.

Courts have consistently disapproved of "blanket bans" on publications as unconstitutional restrictions not reasonably related to prison officials' penological interest in combatting prison security risks.  *See, e.g., Thomas v. Leslie,* 176 F.3d 489, 1999 WL 281416, at *7 (10th Cir. 1999) (unpublished table opinion) ("We agree with the district court that the absolute ban on newspapers does not constitute a 'valid, rational connection between the prison regulation'" and the sheriff's stated objective of preventing fire hazards and the use of newspapers as weapons) (quoting *Turner*, 482 U.S. at 89)); *Khan v. Barela*, 808 F. App'x 602, 608 (10th Cir. 2020) ("The implication of [*Bell v. Wolfish*, 441 U.S. 520 (1979)] and [*Jones v. Salt Lake County*, 503 F.3d 1147 (10th Cir. 2007)] is that a complete ban on hardcover books or newspapers would likely violate the First Amendment," notwithstanding the "usual justification[]" given for such a ban—"limiting contraband"); *Hum. Rts. Def. Ctr. v. Sw. Virginia Reg'l Jail Auth.*, 396 F. Supp. 3d 607, 620 ("*Sw. Virginia*") (W.D. Va. 2019) ("Books sent directly from publishers pose little risk of drug smuggling…The Jail Authority's interests in preventing fires and drug smuggling are certainly legitimate, but the undisputed evidence shows that a complete ban on books sent from publishers is not rationally related to those interests."). Yet NMCD and the MTC Defendants have enacted unlawful policies and practices which have practically resulted in such a ban for any and all publications mailed to incarcerated persons from publishers like HRDC.

Notably, this change was implemented without either NMCD or the MTC Defendants

publicly citing any incidents—let alone a pattern—from their own prisons or elsewhere in the country of security breaches involving materials sent directly from HRDC or other publishers. Clark Decl. ¶ 48.  The truth is that there is no practical security risk in allowing HRDC—a not-for-profit charitable organization that has been mailing publications to incarcerated persons at thousands of jails and prisons for over thirty-four years without incident—to send magazines and other hard copy publications to incarcerated persons.  First Wright Decl. ¶¶ 2, 11-12, 20; Clark Decl. ¶¶ 56-61; *see also White v. Dona Ana Cnty. Det. Ctr.*, No. CV 08-0955 WJ/GBW, 2011 WL 13291138, at *7 (D.N.M. Jan. 12, 2011) ("Books mailed directly from publishers that have never had the opportunity to be tampered with by a third party do not pose a smuggling risk[.]").

In fact, NMCD's Mail Policy continues to provide that incarcerated persons will be allowed to receive publications directly from an approved publisher or vendor.  Muñoz Decl. ¶ 2, Ex. A at 6.  This is notwithstanding the fact that NMCD updated the Mail Policy on May 27, 2025 with the instruction that all non-legal mail be sent to Smart Communications, *id.* at 3, without incorporating the December 2021 memorandum stating that mail which cannot be run through a scanner (e.g., magazines) will not be allowed, and without making any revisions to the existing procedures governing publications.  NMCD and the MTC Defendants' "complete inability to reconcile [their] policies and practices undermines the deference typically afford to prison officials," and "succeeds only in demonstrating the arbitrary nature" of the policy changes that have been carried out at NMCD prison facilities in the last four years.  *Hum. Rts. Def. Ctr. v. Baxter Cnty., Ark.*, 667 F. Supp. 3d 959, 987 ("*Baxter II*") (W.D. Ark. 2023), *aff'd*, 129 F.4th 498 (8th Cir. 2025) ("*Baxter III*").

Many prison and jail systems have implemented "publisher-only" policies, which only allow publications to be mailed to incarcerated persons from commercial or non-profit sources

such as publishers and book stores, as a way to prevent contraband from being introduced into their facilities.  Clark Decl. ¶ 56.  But in rejecting HRDC's publications, neither NMCD nor the MTC Defendants have provided a logical explanation as to why their interest in preventing contraband is not served by NMCD's on-the-books policy allowing incarcerated persons to receive publications when sent directly from an approved publisher or vendor.  There is simply no rational basis or penological justification for NMCD's decision to implement what has amounted to a total ban HRDC's publications.  Clark Decl. ¶¶ 53, 65-66.

In fact, banning books, magazines, and other publications actually undermines prison security, as reading can help people adjust to confinement and reduce the isolation, idleness, boredom and frustrations that can result in aggressive or disruptive behaviors.  Clark Decl. ¶¶ 27-28, 32-34, 46, 66; First Wright Decl. ¶ 13.  "Since most offenders will eventually return to society, a paramount objective of the corrections system is the rehabilitation of those committed to its custody."  *McKune v. Lile*, 536 U.S. 24, 36 (2002) (internal citations and alterations omitted).  Further, "the weight of professional opinion seems to be that inmate freedom to correspond with outsiders advances rather than retards the goal of rehabilitation …."  *Martinez*, 416 U.S. at 412; *see also Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 63 (1973) (citing the "well nigh universal belief that good books … lift the spirit, improve the mind, enrich the human personality, and develop character ….") (citations omitted).  The information in HRDC's books and newsletters facilitates the penological interest of helping prepare incarcerated persons for reentry into society.  Clark Decl. ¶¶ 27, 34, 66; First Wright Decl. ¶ 13.  Understanding the benefits of the availability of reading materials, corrections professionals recognize that any minimal security concerns associated with incarcerated persons receiving and possessing publications are outweighed by the safety and security benefits they bring.  *See* Clark Decl.

¶¶ 27-28, 32-37, 40, 43, 46, 50, 66.

The publications that the MTC Defendants rejected otherwise comply with all other provisions of the NMCD Mail Policy.  They are not "detrimental to internal security of the institution or other legitimate penological interests," nor do they run afoul of any reasonable interpretation of the NMCD Mail Policy rules.  Muñoz Decl. ¶ 2, Ex. A at 8.  To the extent that Defendants may assert the censored publications run afoul of one of these categories, they are unconstitutionally vague and overbroad in application for a publisher or distributor to know what is permissible and what is prohibited.  *See Am. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) ("In the First Amendment context … a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." (quoting *United States v. Stevens*, 559 U.S. 460, 473, (2010)); *Frank v. Lee*, 84 F.4th 1119, 1151 (10th Cir. 2023).

> ### 2.    The MTC Defendants Have Failed to Provide Alternative Means of Exercising HRDC's First Amendment Rights.

The second *Turner* factor looks to whether alternative means exist to exercise the constitutional right.  While the alternative means do not have to be "ideal," they do have to be "available."  *Overton v. Bazzetta*, 539 U.S. 126, 135 (2003).  "If the alternative means are illusory, impractical, or otherwise unavailable, this would weigh in favor of HRDC under the second *Turner* factor."  *Hum. Rts. Def. Ctr. v. Baxter Cnty. Ark.*, 999 F.3d 1160, 1165 ("*Baxter I*") (8th Cir. 2021).  The absence of alternative means is evidence that the prison regulations in question are unreasonable.  *See Beard v. Banks*, 548 U.S. 521, 532 (2006).

Here, the MTC Defendants' censorship of HRDC's publications leaves HRDC without any practical alternative means of exercising the First Amendment right at issue, *see Turner*, 482 U.S. at 90—the right to distribute its publications to incarcerated persons in furtherance of its

mission to help incarcerated persons to educate themselves about their constitutional and human rights. *See* First Wright Decl. ¶¶ 13, 47-48. HRDC cannot effectively or reasonably be expected to communicate its writings to incarcerated persons by telephone or in-person. *Id.* ¶ 48; *see also Baxter III*, 129 F.4th at 505 (finding that the second *Turner* factor favored HRDC where "[p]ublications like books and magazines cannot practically be communicated through postcards, phone calls, or in-person visits from HRDC"). HRDC's messages can be conveyed effectively only through print publications. *See Jacklovich v. Simmons*, 392 F.3d 420, 431 (10th Cir. 2004) (even if incarcerated persons can obtain information from other means, such as television or radio, that "is not an adequate substitute for reading newspapers and magazines.").

Under the MTC Defendants' current policies and practices, HRDC is left with no practical way to reach its intended audience.

### 3. The MTC Defendants' Mail Policies and Practices Fail The Third and Fourth Prongs of the *Turner* Standard (Effect On Resources and Feasibility of Alternative Policies).

The third and fourth *Turner* factors turn on whether accommodating the First Amendment right at issue will impose a significant burden on prison officials, and whether ready alternatives to the challenged policies exist. *Turner*, 482 U.S. at 90-91. Where a plaintiff "can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 91. "[T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.* at 90.

Allowing the exercise of the First Amendment rights at issue here will create no significant burden on prison officials at OCPF, other incarcerated persons, or the allocation of resources. In fact, as noted above, NMCD's Mail Policy already has a system in place for

processing, reviewing, and delivering publications directly to incarcerated persons when sent from approved publishers or vendors, including the establishment of a Publications Review Panel for individualized determinations regarding rejected publications. Muñoz Decl. ¶ 2, Ex. A at 6, 8-10. Neither NMCD nor the MTC Defendants have publicly explained why it would be a significant burden on their staff to comply with their own publicly promulgated correspondence policies and deliver HRDC's publications to their intended recipients. *See Sw. Virginia*, 396 F. Supp. 3d at 622-23 (finding third and fourth *Turner* factors favored HRDC where there were already "policies and procedures [in place to] address the cited concerns" and the Jail Authority had been delivering *Prison Legal News* and *Criminal Legal News* for nearly a year without any "significant burden or safety issues.").

This is what thousands of other correctional facilities do with the very HRDC magazines and books that the MTC Defendants are refusing to deliver. First Wright Decl. ¶¶ 11-12. HRDC does not send a high volume of mail to OCPF, but rather sends individually addressed mailings to a limited number of incarcerated persons who subscribe to its magazines or who place orders for books published and/or distributed by HRDC, or who are specifically identified by HRDC as potential subscribers or people likely to be in need of the information contained in the publications that HRDC distributes. *Id.* ¶ 14.

Regardless, limited effects on staff time do not justify restrictions on First Amendment rights. *See, e.g.*, *Prison Legal News v. Lehman*, 397 F.3d 692, 700 (9th Cir. 2005) (rejecting regulation designed to reduce volume of mail); *Cook*, 238 F.3d at 1151 (rejecting administrative burden justification for banning certain type of mail where lifting the ban would result only in "the addition of 15 to 30 pieces of mail" each day).

That thousands of correctional facilities nationwide allow incarcerated persons to receive

HRDC's magazines and books without creating penological problems highlights that NMCD's

Mail Policy with respect to publications remains a ready alternative to the total ban on books,

magazines, and other publications created by the 2021 memorandum. *See, e.g.*, *Jacklovich*, 392

F.3d at 432 (in evaluating ban on publications the policies in other state and federal institutions

are relevant); *Hrdlicka v. Reniff*, 631 F.3d 1044, 1055 (9th Cir. 2011) (final *Turner* factor

favored publisher where it was undisputed that publisher's magazine was already distributed in

other county jails).  Defendants' concern with preventing smuggling contraband may be

legitimate, but they have shown an unwillingness to look at the actual evidence and risks at play

here.  Clark Decl. ¶ 64.  The MTC Defendants' censorship is unnecessary and unreasonable, and

is an "exaggerated response" that cannot stand.  *Turner*, 482 U.S. at 91; *see also Baxter II*, 667 F.

Supp. 3d at 983 (Baxter County's ban on publishers providing publications to incarcerated

persons was a "far-reaching, indiscriminate, permanent prohibition" that "constituted an

exaggerated response to the County's legitimate interest in security and efficiency").  HRDC is

thus highly likely to succeed on the merits of its free speech claims.

**B.     The MTC Defendants Have Violated the Due Process Clause By Failing To
        Provide HRDC With Notice And Opportunity To Challenge Censorship.**

A publisher's right to communicate with incarcerated persons is rooted not only in the

First Amendment, but also the Due Process Clause of the Fourteenth Amendment:

> [T]he decision to censor or withhold delivery of a particular letter must be
> accompanied by minimum procedural safeguards.  The interest of prisoners and
> their correspondents in uncensored communication by letter, grounded as it is in
> the First Amendment, is plainly a "liberty" interest within the meaning of the
> Fourteenth Amendment even though qualified of necessity by the circumstance of
> imprisonment.  As such, it is protected from arbitrary government invasion.

*Martinez*, 416 U.S. 417-18.  The Tenth Circuit "recognize[s] that both inmates and publishers

have a right to procedural due process when publications are rejected."  *Jacklovich*, 392 F.3d at

433; *see also Montcalm Publ'g Corp. v. Beck*, 80 F.3d 105, 106 (4th Cir. 1995) ("We hold that

publishers are entitled to notice and an opportunity to be heard when their publications are disapproved for receipt" by incarcerated subscribers). The Due Process Clause requires that when a prison refuses to deliver a publication or other correspondence to the intended recipient, it must provide both the incarcerated person and the sender notice and an opportunity to challenge the censorship. *Jacklovich*, 392 F.3d at 433. This requirement is clearly established and is not subject to the four-pronged *Turner* analysis. *See Jacklovich*, 392 F.3d at 433; *Krug v. Lutz*, 329 F.3d 692, 698 n.5, 698-99 (9th Cir. 2003); *Cook*, 238 F.3d at 1152-53.

Providing due process allows publishers to investigate and challenge violations of their First Amendment rights, and helps subscribers challenge such violations through the correctional grievance system. *Jacklovich*, 392 F.3d at 433 (citing *Montcalm Publ'g Corp.*, 80 F.3d at 106, 109). Correctional facilities in other jurisdictions provide due process to publishers and incarcerated persons when refusing to deliver publications and other correspondence. Clark Decl. ¶ 55; First Wright Decl. ¶ 45. The Federal Bureau of Prisons has an explicit policy requiring it to notify incarcerated persons and publishers, identifying the specific materials rejected and allowing independent review of a rejection decision. Clark Decl. ¶ 36.

The MTC Defendants failed to provide due process protections to HRDC when refusing to deliver its publications to incarcerated persons at OCPF. To date, they have engaged in at least one hundred sixty (160) instances of censorship of HRDC's mail, and HRDC did not receive meaningful notice or opportunity to challenge the censorship of any of them. Second Wright Decl. ¶¶ 8, 18. At no point did the MTC Defendants contact HRDC to provide notice that its mailings would be rejected. *Id.* ¶ 18. And rejecting HRDC's mailings and returning them via the USPS Return to Sender service does not qualify as "notice." None of the returned items contained any notice of a right to appeal the rejections, or any information on how HRDC

could challenge the censorship, nor does the NMCD Mail Policy or the 2021 memorandum contain any such process. *Id.*; Shinn-Krantz Decl. ¶¶ 4, 5, Ex. A. HRDC is thus highly likely to succeed on the merits of its due process claims.

## II. A PRELIMINARY INJUNCTION IS NECESSARY TO PREVENT IRREPARABLE HARM.

The MTC Defendants' unconstitutional policies and practices prevent HRDC from carrying out its core function—to communicate with incarcerated persons about developments in the law and protection of their health and personal safety. First Wright Decl. ¶¶ 13, 46-47. As the Supreme Court and Tenth Circuit have held, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373; *see also Planned Parenthood*, 828 F.3d at 1263; *Pryor*, 99 F.4th at 1254; *Reed*, 719 F. App'x at 780. Courts have repeatedly found irreparable harm based on the denial of First Amendment rights in correctional settings. *See, e.g.*, *Jones v. Caruso*, 569 F.3d 258, 277 (6th Cir. 2009) (affirming grant of preliminary injunction against prison mail policy); *Prison Legal News v. Cnty. of Ventura*, No. CV 14–773–GHK (Ex), 2014 WL 2519402, at *8, *10 (C.D. Cal. May 29, 2014) (granting preliminary injunction against jail's postcard-only policy); *Prison Legal News v. Betterton*, No. 2:12-CV-00699-JRG, ECF No. 30 (E.D. TEx. Sept. 30, 2013) (granting preliminary injunction against jail's impermissibly vague and arbitrary policy on mail censorship and inadequate appeals process).

HRDC's magazines cover recent events and judicial decisions that affect the lives and legal cases of incarcerated persons, and its books provide incarcerated persons with in-depth information about their rights, protections and legal remedies, and educational opportunities. First Wright Decl. ¶¶ 6, 8. The ability to deliver its publications timely—and before news becomes stale or filing deadlines expire—is critical to HRDC's mission. *Id.* ¶ 47. If HRDC

loses the opportunity to deliver these publications to incarcerated persons, it has lost precious opportunities to communicate with them at a time when the information will be most useful. *Id.* ¶¶ 6, 8, 46-47. An injunction is thus necessary to prevent irreparable harm to Plaintiff.

## III. THE BALANCE OF EQUITIES FAVORS A PRELIMINARY INJUNCTION.

Given the irreparable harm that HRDC will suffer if a preliminary injunction does not issue, the balance of equities here tips decidedly toward Plaintiff. The irreparable harm suffered by HRDC is concrete, severe and ongoing. *See* Section II, *supra*; First Wright Decl. ¶¶ 44, 47-48, 50. HRDC is blocked from distributing its publications to incarcerated persons at OCPF, and without an injunction, the MTC Defendants will continue to censor HRDC's publications without due process, banning its core protected speech. By contrast, any potential injuries to the MTC Defendants are minimal and speculative. No great cost or expenditure of time is required to deliver HRDC's materials to incarcerated persons and provide constitutionally mandated due process, as already happens in correctional facilities across the country. First Wright Decl. ¶¶ 11-12; Clark Decl. ¶¶ 30, 35-36, 51-53. Given the penological benefits of access to publications, the injunction would likely improve security and promote rehabilitation. Clark Decl. ¶¶ 27-28, 32-34, 46, 66. The balance of equities favors Plaintiff.

## IV. A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST.

Courts have consistently recognized the significant public interest in upholding free speech principles. The public interest is served by "protecting the core First Amendment right of political expression." *Homans v. City of Albuquerque*, 264 F.3d 1240, 1244 (10th Cir. 2001); *see also Herrera v. Santa Fe Pub. Sch.*, 792 F. Supp. 2d 1174, 1199 (D.N.M. 2011) ("'[I]t is always in the public interest to prevent the violation of a party's constitutional rights.'"). The public interest inquiry primarily addresses the impact "*on nonparties rather than on the parties*." *Herrera*, 792 F. Supp. 2d at 1198-99 (emphasis in original); *McClendon v. City of Albuquerque*,

272 F. Supp. 2d 1250, 1259 (D.N.M. 2003) ("The public has an interest in [government's] maintenance of prison facilities that provide the minimal conditions of confinement required by the Constitution and federal law.").

The MTC Defendants' mail policies and practices harm not only HRDC, but also other publishers and distributors—who presumably have been and will continue to be censored without due process absent an injunction—as well as incarcerated persons and staff at OCPF and the general public outside of OCPF.  It is in the public interest to allow incarcerated persons access to reading materials, which enable them to engage in productive activity rather than sitting idle, thus helping to avoid conflicts and incidents of violence.  Clark Decl. ¶¶ 27-28, 32-34, 46, 66.  By educating incarcerated persons about their rights and key legal developments that affect their lives and legal cases, HRDC encourages them to channel their energies into lawful methods of dispute resolution.  First Wright Decl. ¶ 13.  Reading materials also help incarcerated persons keep their minds sharp and engage in productive activity and thereby reduce conflicts in prisons, and help them prepare to become productive citizens when released back into society.  *Id.*; Clark Decl. ¶¶ 27-28, 32-34, 46, 66.  An injunction serves the public interest.

## V.    THE BOND REQUIREMENT SHOULD BE WAIVED.

Under Fed. R. Civ. P. 65(c), district courts have wide discretion to set the amount of the bond accompanying a preliminary injunction, which includes setting no bond or only a nominal bond.  *See Voter Reference Found., LLC v. Balderas*, 616 F. Supp. 3d 1132, 1204 (D.N.M. 2022), *appeal dismissed as moot sub nom. Voter Reference Found., LLC v. Torrez*, No. 22-2101, 2024 WL 3861750 (10th Cir. Apr. 2, 2024) ("Courts in the Tenth Circuit have wide discretion under Rule 65(c) in determining whether to require security and may, therefore, impose no bond requirement."; *id.* at 1274 ("A bond is 'not required to obtain preliminary injunctive relief when a plaintiff is seeking to prevent a government entity from violating the First Amendment.'"

(citation omitted)); *see also RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1215 (10th Cir. 2009) (bond was not required upon issuance of injunction); *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003) (no abuse of discretion where district court required no bond in the absence of proof showing likelihood of harm).

Several factors here warrant waiver of the bond requirement. The "harm" to the MTC Defendants if enjoined—*i.e.*, being forced to employ a constitutional mail policy—is minimal and non-monetary, if it exists at all. Further, HRDC is a small nonprofit organization with a staff of approximately thirteen employees, and does not have financial resources to post anything more than a nominal bond. First Wright Decl. ¶ 49; *Colo. Wild v. U.S. Forest Serv.*, 299 F. Supp. 2d 1184, 1191 (D. Colo. 2004) (granting preliminary injunction and waiving bond requirement where non-profit environmental group was unable to post more than a nominal bond). Requiring HRDC to post a bond would effectively deny access to prompt judicial review. *Utahns For Better Transp. v. U.S. Dep't of Transp.*, Nos. 01-4216, 01-4217, 01-4220, 2001 WL 1739458, at *5 (10th Cir. Nov. 16, 2001) ("The bond must not be set so high, however, as to deny the moving party its right to judicial review of its claims."). This is especially true because HRDC alleges violations of its fundamental constitutional rights, seeks to vindicate the public interest, and is likely to succeed on the merits. *See Voter Reference Found.*, 616 F. Supp. at 1274. The bond requirement should be waived.

## **CONCLUSION**

For the foregoing reasons, Plaintiff's Second Motion for Preliminary Injunction should be granted.

/ / /

/ / /

/ / /

September 17, 2025                          ROSEN BIEN GALVAN & GRUNFELD LLP

                                           By: */s/ Brenda Muñoz*
                                                Ernest Galvan, Cal. Bar No. 196065
                                                Benjamin Bien-Kahn, Cal. Bar No. 267933
                                                Marc J. Shinn-Krantz, Cal. Bar No. 312968
                                                Brenda Muñoz, Cal. Bar No. 328813
                                                Attorneys for HUMAN RIGHTS
                                                DEFENSE CENTER
                                                101 Mission Street, Sixth Floor
                                                San Francisco, California 94105-1738
                                                Telephone: (415) 433-6830
                                                Facsimile: (415) 433-7104
                                                *Admitted *Pro Hac Vice*


September 17, 2025                          HUMAN RIGHTS DEFENSE CENTER

                                           By: */s/ Jonathan P. Picard*
                                                Jonathan P. Picard, Fla. Bar No. 105477
                                                P.O. Box 1151
                                                Lake Worth, Florida 33460
                                                Attorney for HUMAN RIGHTS
                                                DEFENSE CENTER
                                                Telephone: (561) 360-2523
                                                Facsimile: (561) 828-8166
                                                *Admitted *Pro Hac Vice*


September 17, 2025                          IVES & FLORES P.A.

                                           By: */s/ Laura Schauer Ives*
                                                Laura Schauer Ives, SB# 12463
                                                Adam C. Flores, SB# 146686
                                                Attorneys for HUMAN RIGHTS
                                                DEFENSE CENTER
                                                925 Luna Circle NW
                                                Albuquerque, New Mexico 87102
                                                Telephone: (505) 364-3858
                                                Facsimile: (505) 364-3050

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served upon all counsel of record on the day of its filing via the CM/ECF electronic filing system.

*/s/ Brenda Muñoz*
Brenda Muñoz

[4734457.4]