**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

HUMAN RIGHTS DEFENSE CENTER,

    *Plaintiff*,

    v.                          No. 1:24-cv-01091-SMD-KRS

MICHELLE LUJAN GRISHAM, individually
and in her capacity as Governor of the State of
New Mexico; ALISHA TAFOYA LUCERO,
individually and in her capacity as Cabinet
Secretary of the New Mexico Corrections
Department; MELANIE MARTINEZ,
individually and in her capacity as Deputy
Secretary of the New Mexico Correction
Department; GARY MACIEL, individually and
in his capacity as Deputy Secretary of the New
Mexico Correction Department; BRIAN R. EVANS,
 individually and in his capacity as
Chief Executive Officer of The GEO Group, Inc.;
WAYNE H. CALABRESE, individually
and in his capacity as President and
Chief Operating Officer of The GEO Group, Inc.;
THE GEO GROUP, INC. d/b/a LEA COUNTY
CORRECTIONAL FACILITY, a corporation;
SCOTT MARQUARDT, individually and in his
capacity as Chief Executive Officer of
Management & Training Corporation;
DANIEL MARQUARDT, individually and
in his capacity as President of Management & Training
Corporation; MANAGEMENT & TRAINING
CORPORATION d/b/a OTERO COUNTY
PRISON FACILITY, a corporation; JOHN
AND JANE DOES 1-20, individually and in
their official capacities; and ENTITIES 1-10,

    *Defendants*.

<u>**AMENDED MEMORANDUM ORDER**</u>

**THIS MATTER** is before the Court on Defendant The GEO Group, Inc. ("GEO")'s unopposed motion (Doc. 159) to revise the Court's order granting partial preliminary injunction (Doc. 151), which was filed on February 20, 2026.

Having reviewed the parties' submissions, the record, and the relevant law, the Court **GRANTS** GEO's unopposed motion to revise the preliminary injunction. The following Amended Memorandum Order modifies the scope of injunctive relief as to GEO and supersedes the Court's previous Memorandum Order (Doc. 151).

## BACKGROUND

The New Mexico Corrections Department ("NMCD") is a cabinet-level agency of the State of New Mexico, organized and existing under New Mexico law. Doc. 76 ("FAC") ¶ 10. During the period relevant to this action, NMCD oversaw ten correctional facilities in New Mexico. *Id*. NMCD directly operates eight of those facilities; the remaining two are operated by private prison contractors, GEO and Management & Training Corporation ("MTC"). *Id*. GEO's contract expired on June 30, 2025 and was not renewed. Doc. 159 ¶ 6. Accordingly, GEO stopped housing state prisoners at its facility as of that date. *Id.*

Plaintiff Human Rights Defense Center ("HRDC") is a non-profit organization whose mission is to provide incarcerated persons with reading materials relevant to constitutional and human rights issues, as well as information concerning access to education. Doc. 3 at 4. In furtherance of that mission, HRDC regularly mails magazines, books, and subscription renewal notices to incarcerated individuals housed in correctional facilities nationwide, including the NMCD facilities. *Id*.

HRDC alleges that NMCD's mail policies are vague and overbroad, and that those policies impose categorical prohibition on certain publications, including HRDC's materials.  Doc. 3 at 16. According to HRDC, NMCD and its private contractors unconstitutionally censored more than 300 mailings sent by HRDC to incarcerated individuals.  *See* Doc. 3 at 20; Doc. 103 at 3.

Based on these allegations, HRDC brings claims under 42 U.S.C. § 1983 against the Governor of New Mexico, officials of the NMCD (the "NMCD Defendants"), GEO, MTC, and certain employees of those entities.  *See* FAC.  In the present motion, HRDC seeks preliminary injunction enjoining the alleged censorship of its publications at the NMCD facilities, challenging NMCD's mail policies both facially and as applied.  Doc. 3 at 2.  NMCD is not a party to this action.  *See* FAC ¶ 10.  As used in this Order, the term "NMCD Defendants" refers to the state officials sued in their individual and official capacities in connection with the challenged mail policies.

Defendants, however, deny that they enforce any categorical ban on incoming publications and further contend that no ongoing or systemic censorship of HRDC's materials exists.  Doc 19 at 9; Doc. 29 at 16–17; Doc 114 at 3.  According to Defendants, although the precise reason for many of the rejections remains unclear absent discovery, the rejections resulted from isolated incidents rather than an unconstitutional policy.  *See* Doc. 29 at 16.

## I.      The Mail Policies Under Challenge

### a.   The Publicly Available Mail Policy

NMCD maintains a set of policies governing inmate correspondence, which are publicly available on its website under the "Inmate Rights" section (collectively, the "NMCD Mail Policy"

or "Policy").[1]  While the Policy outlines certain security-related restrictions, its general premise is that incoming publications are permitted.

For example, 5-ACI-7D-01 provides: "[i]nmates will have access to publications."  Policy at 4.  Relatedly, 5-ACI-7D-04-1 states that "[i]nmates will be allowed to receive publications when received directly from the publisher or vendor," subject to criteria set forth in the rejection-of-mail section.  *Id*. at 6.

Although the wording of Policy 5-ACI-7D-04 has been revised over time, its substance has not materially changed.  Earlier versions provided that "[b]ooks and magazines will be accepted and delivered to inmates if they are received directly from the publisher or vendor."[2]  The current version replaces the phrase "books and magazines" with the more general term "publications."[3]  *Id*. at 6.

---

[1] *See* Doc. 3-1 at 2 (providing link to the current NMCD Mail Policy).
[2] *See id*. at 2–3 (providing links to the 2015, 2022, and 2024 versions of the NMCD Mail Policy).
[3] The pre-2022 version of the Mail Policy provides that:

> Books and magazines will be accepted and delivered to inmates if they are received directly from the publisher or vendor, subject to other restrictions set out herein and in Special Management policies.  § J1 (5-ACI-7D-04)

The 2022 version of the Mail Policy repeats that authorization verbatim.
The 2023 revision to the Mail Policy replaced "books and magazines" with the more general "publications":

> Inmates will be allowed to receive publications when received directly from the publisher or vendor, pursuant to specified criteria described in rejection of mail procedures below.

The current version of the Mail Policy further narrows that authorization by replacing "publisher or vendor" with "approved vendors."  It provides that:

> Inmates will be allowed to receive publications when received directly from approved vendors, pursuant to specified criteria described in rejection of mail procedures below.

Despite these changes in wording, every version of the Mail Policy expressly permits incarcerated persons housed in NMCD facilities to receive publications.

b.    Limitations on Publications Sent to Incarcerated Persons

The limitations on incoming mail are set forth in 2-CO-5D-01-I, titled "Rejection of Mail, Enclosures and Publications." *See* Doc. 3-1 at 3–5; Policy at 8–9.  HRDC challenges six provisions within that section, alleging that each is unduly vague and overbroad:

1.  Mail, enclosures, packages, photos and publications will be rejected if they are detrimental to internal security of the institution or other legitimate penological interests.  Rejection examples below may not be all inclusive but are intended as a reference:

a. Item contains contraband.
b. Item facilitates criminal activity.
. . .
d. Item depicts, describes, or encourages activities which may lead to the use of physical violence or group disruption.
. . .
l. Item contains a pictorial depiction of nudity or a pictorial depiction of sexual activity, unless the item, taken as a whole, is literary, artistic, educational, or scientific in nature.
. . .
n. Item contains written sexually explicit material which, by its nature or content, poses a threat to the security, good order, or discipline of the correctional facility.
. . .
q. Item violates facility rules and regulations.

Doc. 3 at 10; Policy at 9–10.

The NMCD Mail Policy further provides that decisions to reject publications are made on an individualized basis.  *See* Policy at 3, 10.  A three-person panel, composed of staff designated by the Deputy Director of Adult Prisons, reviews each rejection and determines whether it is justified.  *Id*. at 9.

When a publication is rejected, the incarcerated recipient is notified in writing through a "Publication Review Panel Determination" form.  *See id*. at 10.  The Policy does not indicate whether the recipient or the publisher may appeal the panel's decision, nor does it identify procedures for doing so.

5

c.    The 2021 Memorandum

In addition to the Mail Policy, on December 29, 2021, NMCD issued a memorandum titled "Inmate Mail Changes" ("2021 Memorandum" or "Memorandum") addressing offender families. *See* Doc. 3-1 at 8–9.  The memorandum states that magazines will no longer be accepted at NMCD facilities because they are incapable of passing through the scanner.  *Id*. at 8.  Unlike the Mail Policy, which generally authorizes incarcerated persons to receive publications, the 2021 Memorandum imposes a categorical prohibition on magazines.  *Id*.

None of the subsequent revisions to the Mail Policy incorporates that prohibition or explains how a categorical ban on magazines can be reconciled with the Policy's continued authorization for inmates to receive publications.

HRDC alleges that shortly after issuance of the memorandum, Defendants began censoring HRDC's books, magazines, and other correspondences to incarcerated persons.  Doc. 3 at 5.

d.    Additional Communications From NMCD

At the same time, other communications from NMCD suggest a broader and internally inconsistent understanding of the operative mail rules.

Some of the returned HRDC mailings bear cursory markings and stamps on the envelopes that fail to provide a meaningful explanation for the rejection.  Rejection notices returned to HRDC variously state "Return to Sender," "RTS," "Denied," and "Refused."  *Id*. at 8–9.  HRDC alleges that, in all but four instances, Defendants failed to identify any reason for the rejection of its mailings.  Doc. 3 at 8.

A December 15, 2022 letter from the Penitentiary of New Mexico went further, declaring that that inmates at the facility "are not allowed to have any [p]ublications."  Doc. 3-2 at 49.

6

After HRDC challenged the rejections of its materials, NMCD's Deputy General Counsel, Brenden J. Murphy, responded on NMCD's behalf. *See* Doc. 29-2. The response acknowledged receipt of HRDC's complaints, inquired whether HRDC would be willing to donate materials to facility libraries, and asked whether the affected HRDC materials were available in electronic format. *Id*. The letter nonetheless reiterated that "magazines are not allowed." *Id*.

e. The Resulting Impact on HRDC

In light of the foregoing policies and communications, HRDC alleges that Defendants failed to apply NMCD's mail restrictions in a uniform manner, resulting in the rejection of a substantial number of HRDC's publications. *See* Doc. 3 at 15. These inconsistent interpretations of the operative mail rules led to uneven enforcement across the facilities. *Id*. Despite the 2021 Memorandum and internal communications imposing a sweeping ban on magazines or even all publications, however, the majority of HRDC's mailings continued to reach their intended recipients at NMCD facilities. *See* Doc. 29 at 17. HRDC concedes that "some intended recipients are still receiving HRDC's mailings even as many others are censored." Doc. 3 at 15. HRDC characterizes this inconsistent application of the mail policies as arbitrary and capricious, contending that such enforcement lacks a rational relationship to any legitimate penological interest. *Id*.

Defendants deny any ongoing censorship of HRDC's publications, contending that more than a thousand HRDC subscription materials were successfully delivered to incarcerated individuals throughout the relevant timeframe. Doc. 29 at 6.

As to the scope of the alleged rejections, HRDC represents that Defendants rejected at least 152 publications. The specific breakdown of these materials includes 73 issues of *Prison Legal News*, 48 issues of *Criminal Legal News*, 20 copies of the book *Protecting Your Health and Safety*

("*PYHS*"), nine copies of HRDC's annual report booklets, one copy of *The PLRA Handbook*, and one renewal letter sent to a subscriber.  Doc. 3 at 6, 20.

Defendants dispute the accuracy of those figures.  NMCD Defendants represent that at least two of the intended recipients were not incarcerated at the listed facility during the relevant period.  Doc. 29 at 2.  Defendant GEO similarly identified two instances in which either the intended recipient was no longer housed at the facility or HRDC misspelled the recipient's last name.  Doc. 19 at 4.

In response, HRDC reports that the total number of censored items has been increasing.  Doc. 46 at 3.  HRDC further contends that, even assuming that certain mailing errors should not be regarded as censorship, Defendants have not justified the rejection of the remaining mailings.  *Id*. at 1–2.

HRDC subsequently filed a second motion for preliminary injunction against MTC, which became a party through the First Amended Complaint.  *See* Doc. 103.  HRDC alleges that at least 160 items of mail sent to incarcerated persons at the OCPF were unconstitutionally censored by the MTC Defendants, including 45 issues of *Prison Legal News*, 44 issues of *Criminal Legal News*, and 27 copies of *PYHS*.  *Id*. at 7.

## LEGAL STANDARD

A preliminary injunction has the "limited purpose" of "preserv[ing] the relative positions of the parties until a trial on the merits can be held."  *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1269 (10th Cir. 2018).  It is an "extraordinary remedy never awarded as of right."  *Id*.  "A party may be granted a preliminary injunction only when monetary or other traditional legal remedies are inadequate, and the right to relief is clear and unequivocal."  *Id*.

8

A party seeking a preliminary injunction must show: "(1) the movant is substantially likely to succeed on the merits; (2) the movant will suffer irreparable injury if the injunction is denied; (3) the movant's threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest."  Fed. R. Civ. P. 65(c); *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016).

### DISCUSSION

Imprisonment does not automatically deprive a prisoner of constitutional protections. *Turner v. Safley*, 482 U.S. 78, 93 (1987).  At the same time, the Constitution permits greater restrictions on fundamental rights in prison than it would allow elsewhere, and courts owe "substantial deference to the professional judgment of prison administrators."  *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003); *id.* at 84–85.  Restrictive prison regulations are permissible as long as they are "reasonably related to legitimate penological interests."  *Beard v. Banks*, 548 U.S. 521, 521–22 (2006); *Turner*, 482 U.S. at 89.

That deference, however, is not boundless.  Prison walls do not "bar free citizens from exercising their own constitutional rights by reaching out to those on the inside."  *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989).  "[T]here is no question that publishers who wish to communicate with those who, through subscription, willingly seek their point of view have a legitimate First Amendment interest in access to prisoners."  *Id.* at 408.

Reconciling these principles "requires balancing between the constitutional rights retained by inmates and those who send them publications against the deference owed to prison authorities when it comes to prison administration."  *Turner*, 482 U.S. at 84–85.  In *Turner v. Safley*, the Supreme Court set forth the framework for assessing the constitutionality of prison regulations. Although the Supreme Court has later expressed reservations about the premises underlying

*Turner* and its progeny, the four-factor *Turner* test remains the controlling standard for evaluating the constitutionality of prison regulations. *See Beard*, 548 U.S. at 537 (holding in concurrence that *Turner* and its progeny "rest on the unstated (and erroneous) presumption that the Constitution contains an implicit definition of incarceration").

Accordingly, *Turner* requires courts to consider: (1) whether a valid and rational connection exists between the regulation and the asserted legitimate governmental interest, (2) whether alternative means of exercising the constitutional right remain available to inmates, (3) any effect accommodating the right would have on guards and inmates, and (4) the absence of ready alternatives. *Turner*, 428 U.S. at 89–90.

Courts applying *Turner* ordinarily evaluate the four factors against a clearly identified prison regulation. Here, however, HRDC has not clearly demonstrated whether the challenged rejections resulted from the application of a formal policy or from discretionary, ad hoc decisions by individual staff members. In turn, Defendants deny the existence of any categorical ban on publications and further dispute that the challenged rejections reflect ongoing censorship. *See* Doc. 29 at 7; Doc. 19 at 9; Doc. 114 at 3.

HRDC challenges at least two sources of policies regulating incoming mail. *See* Doc. 3 at 5, 9. The first is the publicly available NMCD Mail Policy posted on its website. *Id*. at 9. The second is the 2021 Memorandum sent to offender families. *Id*. at 3. HRDC challenges the constitutionality of both. *Id*.

The Mail Policy and the 2021 Memorandum convey materially different directives. While the Mail Policy has undergone multiple revisions in wording, none of the versions imposes a categorical ban on incoming magazines or publications. *See supra* nn. 2–3. Instead, each version

10

affirmatively recognizes some right of incarcerated persons to receive publications. *See id*. The 2021 Memorandum, by contrast, announces a blanket prohibition on magazines. Doc. 3-1 at 8–9.

Although the 2021 Memorandum was not incorporated into the Mail Policy, its legal significance under § 1983 does not turn on formal codification. *See Monell* v. *Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978). A § 1983 claim may rest on constitutional deprivations resulting from "governmental custom," even where "such a custom has not received formal approval through the body's official decision-making channels." *Id*. As the Supreme Court has explained, Congress included "customs and usages" within § 1983 to reach "persistent and widespread discriminatory practices of state officials," even if they are not formal policies *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167–68 (1970).

Accordingly, although the 2021 Memorandum was directed to offender families and did not formally amend the Mail Policy, the Court considers it part of the challenged regulatory framework for purposes of the *Turner* analysis.

HRDC suggests that the 2021 Memorandum has been enforced to some degree, though in an arbitrary and inconsistent manner. *See* Doc. 3 at 15. For instance, the NMCD facilities returned certain HRDC mailings accompanied by rejection forms and letters stating that inmates are "not allowed magazines." *See*, *e.g.*, Doc. 3-2 at 60–61. These notices reflect a categorical prohibition on magazines consistent with the Memorandum's stated directive.

NMCD Defendants, for their part, disclaim the existence of any such categorical ban. In response to HRDC's objections, NMCD Defendants maintain that HRDC's publications "still reach a majority of inmates in NMCD who they are sent to." Doc. 29 at 17. HRDC concedes that many of its mailings are successfully delivered without issue. *See* Doc. 3 at 15.

Taken together, the NMCD communications reflect inconsistent formulations and applications of the rules governing incoming publications, with no clear explanation of how the asserted scanner-based justification supports a selective prohibition on magazines while permitting other printed materials. Aside from a few rejections expressly linked to the magazine ban, *see* Doc. 3-2 at 60–61, HRDC fails to establish the extent to which the 2021 Memorandum has been enforced at the NMCD facilities. To the extent such information exists, it may not be ascertainable on the present record without further factual development.

## II.    The *Turner* Analysis Weighs in Favor of HRDC Regarding the 2021 Memorandum's Magazine Ban

The first *Turner* factor, often described as "the most important," asks whether there is a valid, rational connection between the challenged prion regulation and a legitimate and neutral governmental interest. *Turner*, 428 U.S. at 89–90; *Lewis v. Clark*, 663 F. App'x 697, 701 (10th Cir. 2016).

### a.    The First *Turner* Factor Weighs in Favor of Defendants Regarding the Mail Policy

HRDC challenges both the facial and the as-applied constitutionality of NMCD's Mail Policy, contending that it is vague, overbroad, and lacks a rational connection to a legitimate penological interest. *See* Doc. 3 at 5, 9. NMCD Defendants respond that HRDC has failed to carry its burden and maintain that the challenged provisions are rationally related to recognized penological interests, including institutional security and order. *See* Doc. 29 at 15.

To succeed on a facial challenge in the First Amendment context, a plaintiff must "establish that no set of circumstances exists under which [the ordinance] would be valid." *Harmon v. City of Norman, Okla.*, 61 F.4th 779, 795 (10th Cir. 2023). Because facial challenges "push the judiciary towards the edge of its traditional purview and expertise," courts have warned they are

"strong medicine" and demand a "most exacting analysis." *Ward v. Utah*, 398 F.3d 1239, 1246–47 (10th Cir. 2005).

When evaluating a facial First Amendment challenge to a prison policy, the Tenth Circuit considers the state actor's construction of the policy, including how it is implemented and enforced in practice. *See Jordan v. Sosa*, 654 F.3d 1012, 1019 (10th Cir. 2011) (evaluating facial constitutionality based on the "manner in which it is implemented and enforced by the state actor who administers it").

As explained below, HRDC has not met the exacting standard for a facial challenge by showing that "no set of circumstances exists under which the [NMCD mail policies] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also Raymer v. Enright*, 113 F.3d 172, 174 (10th Cir. 1997). As many of HRDC's publications continue to reach incarcerated recipients with no issues, the Policy has been enforced constitutionally in at least some instances.

HRDC's as-applied challenges of the Mail Policy fall short for a different reason. Although HRDC contends that its publications were rejected pursuant to the Mail Policy, it has not shown a causal link between the rejections at issue and the specific provisions it challenges.

To begin with, HRDC challenges CD-151201(I)(1)(a), which authorizes rejection of mail when an item contains contraband. Doc. 3 at 9. The Policy defines "contraband" to include both "Dangerous Contraband" and "Nuisance Contraband," and provides examples of each. Policy at 1–2. Neither party contends that the publications at issue fall within either category as defined by the Policy. Accordingly, while HRDC includes CD-151201(I)(1)(a) in its as-applied challenge, this provision does not reach the rejection of HRDC's publications.

HRDC also challenges CD-151201(I)(1)(b), which authorizes the rejection of mail if an item is found to facilitate criminal activity. Doc. 3 at 9. HRDC argues that the provision is

impermissibly vague and susceptible to an overbroad interpretation. *Id*. NMCD Defendants respond that this section is self-explanatory and would encompass any item that could be used in furtherance of criminal conduct. Doc. 29 at 11. Similarly, HRDC does not allege that any of its publications were rejected under this provision, nor was it invoked to justify the challenged rejections.

The same is true for the remaining challenged provisions. *See* Doc. 3 at 9. The provisions prohibiting materials depicting physical violence, pictorial nudity, and sexual content are facially specific enough to provide notice of what is prohibited, and HRDC does not allege that any rejections fell under those provisions. The final challenged category, "item violates facility rules and regulations," is potentially susceptible to an overbroad interpretation. *Id*. However, the NMCD Publication Review Panel Determination form requires reviewers to identify the specific regulation or rule violated, thereby mitigating the risk of arbitrary rejections based on the provision's broad wording alone. *See* Policy at 14.

Taken together, HRDC has not shown that any of the challenged provisions of the Mail Policy served as the basis for rejecting its publications, nor has it demonstrated that these provisions are unconstitutional, whether facially or as applied.

b. The First *Turner* Factor Weighs in Favor of HRDC Regarding the 2021 Memorandum

The analysis differs with respect to the 2021 Memorandum, however, because its asserted penological interest is less apparent.

The Memorandum announces that, "[a]t all private and state-run facilities moving forward, mail will no longer be accepted that is comprised of cardboard or other rigid parchment incapable of running through the scanner." Doc. 3-1 at 8. It further specifies that "USPS postal rigid express

envelopes that lay flat but do not bend without creasing would not be accepted and magazines will not be accepted." *Id*.

HRDC contends that the Memorandum marks the beginning of NMCD's censorship of its publications and mailings. Doc. 3 at 5. At the same time, the pleadings reflect that the Memorandum has not been consistently enforced: a substantial portion of HRDC's mailings continue to reach their intended recipients. *See* Doc. 3 at 15; Doc 19 at 9; Doc. 29 at 16–17; Doc 114 at 3. NMCD Defendants do not clarify whether they believe that the Memorandum lacks any governing force or simply remains unenforced after its implementation.

Although both the Supreme Court and the Tenth Circuit have recognized prison security as a legitimate governmental objective, the first *Turner* factor requires more than a conclusory invocation of security concerns. *Thornburgh*, 490 U.S. at 408; *Jones v. Salt Lake Cnty.*, 503 F.3d 1147, 1156 (10th Cir. 2007). "The logical connection between the regulation and its asserted goal must not be so remote as to render the policy arbitrary or irrational." *Jones*, 503 F.3d at 1153.

Here, the asserted justification for the 2021 Memorandum, that rigid materials cannot pass through the scanning equipment, is tenuous. NMCD's Deputy General Counsel expressly acknowledged in a July 28, 2023 response that "softcover books sent to inmates can be accepted at NMCD's facilities." Doc. 29-2. The Memorandum categorically rejects magazines while permitting other printed materials, without explaining why magazines, as opposed to thicker books, are incapable of passing through scanning equipment.

Neither the Memorandum nor Defendants explain how this distinction advances the stated security rationale. Defendants have not explained whether the Memorandum's categorical language reflects a true ban on magazines or instead a requirement that senders route magazines through the third-party vendor for inspection, such that magazines are not prohibited altogether.

If the latter were the case, the 2021 Memorandum would likely satisfy constitutional requirements, because it would operate not as a sweeping ban but an additional safety measure. Neither the Memorandum nor Defendants, however, offer such clarification. On its face, the Memorandum indicates that magazines will be rejected outright.

Consequently, NMCD facilities apply the 2021 Memorandum inconsistently and, in some instances, extend its stated prohibition beyond magazines. For example, the rejection form dated December 18, 2023 lists "[i]nmate not allowed magazines" as the reason for rejection. Doc. 3-2 at 60. Similarly, a rejection form dated June 23, 2023 states that inmates are not allowed to purchase any magazines. *Id*. at 61. A December 15, 2022 letter on official NMCD letterhead states that inmates at the Penitentiary of New Mexico are not allowed to have publications at all. *Id*. at 49. Such statements would impose a sweeping ban on all publications, plainly inconsistent with NMCD's Mail Policy and unsupported by any articulated security rationale.

While prison officials are entitled to deference in matters of institutional security, the record does not establish a coherent, rational connection between the scanner-based justification and the selective prohibition on magazines. The first *Turner* factor favors HRDC as applied to the 2021 Memorandum's magazine ban.

    c.   The Second *Turner* Factor Weighs in Favor of Defendants Because HRDC Materials Are Available in Facility Libraries

The second *Turner* factor considers whether inmates have alternative means of exercising the asserted constitutional right. *Turner*, 428 U.S. at 90. This inquiry does not require that alternatives be ideal or equivalent, but they must be *available* in a meaningful sense. *See Overton*, 539 U.S. at 135; *Pell v. Procunier*, 417 U.S. 817, 823 (1974).

NMCD Defendants contend that this factor favors them because inmates have access to prison libraries and may view materials donated by third parties. Doc. 29 at 15. They further

16

represent that the NMCD facilities are open to accepting donated materials from HRDC and have expressed willingness to explore alternative avenues of access, including digital subscriptions of HRDC's publications.  *Id*. at 3.

A July 28, 2023 letter from NMCD Defendants supports that contention.  *Id*.  NMCD's Deputy General Counsel asked whether making HRDC's publications available through facility libraries would address HRDC's concerns and requested information about the availability of digital subscriptions viewable on e-readers or tablets, as well as back issues.  Doc. 29-2.

In addition, NMCD Defendants point to a June 20, 2024 notice announcing the forthcoming implementation of electronic tablets effective July 1, 2024.  Doc. 29-3.  According to the notice, the tablets will replace the existing mail and telephone vendor and provide access to "a law library, secure legal communications, digital forms, virtual visits, electronic messaging, and entertainment options."  *Id*.  NMCD Defendants do not specify whether HRDC's publications will be accessible on the tablets or whether the tablets will be available at all facilities relevant to this action.

Defendants have not established that these alternatives have been fully implemented or made uniformly available across facilities.  They do allege, however, that HRDC's materials are available through facility libraries, which would constitute an alternative means of exercising the asserted right.  The second *Turner* factor therefore weighs in Defendants' favor.

> d. The Third *Turner* Factor Weighs in Favor of HRDC Because the Impact of the Injunction is De Minimis

The third *Turner* factor considers the impact that accommodation of the asserted rights would have on the guards, other inmates, and the allocation of prison resources.  "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials."  *Turner*, 482 U.S. at 90.

17

HRDC describes its requested relief in broad terms, such as "allowing the exercise of the First Amendment rights." Doc. 3 at 18. More specifically, HRDC seeks an injunction prohibiting Defendants "from unconstitutionally censoring HRDC's books, magazines and correspondence mailed to incarcerated persons, and from failing to provide due process to challenge censorship decisions." *Id*. at 1.

As discussed in the preceding sections, HRDC has not shown that each rejection of its materials constitutes intentional or targeted censorship. Rather, the evidence points to uneven enforcement regarding the scope of the governing rules. All parties agree that HRDC's publications continue to reach a substantial number of incarcerated subscribers. *See* Doc. 3 at 15; Doc 19 at 9; Doc. 29 at 16–17; Doc 114 at 3.

On this record, the Court declines to issue a broadly framed preliminary injunction to "stop the censorship," absent a definitive showing that such censorship exists. Nonetheless, HRDC has demonstrated deficiencies in both the rationale offered for the 2021 Memorandum's categorical ban on magazines and the notice accompanying individual rejection decisions.

The relief granted herein imposes only a minimal burden on Defendants. To the extent that the 2021 Memorandum is overbroad, Defendants need only to clarify or rescind the purported prohibition on all magazines. To the extent rejection notices are deficient, Defendants need to specify the basis for rejection, even in a few words, so that HRDC can understand the reason for the decision. Because these measures would not require substantial additional resources, the third *Turner* factor favors HRDC.

    e.   The Fourth *Turner* Factor Carries Limited Weight Because Not All Alleged Violations Are Linked to a Clearly Defined Policy

The fourth *Turner* factor asks whether the challenged regulation represents an "exaggerated response" to legitimate penological interests, that is, whether obvious, easy alternatives exist that

18

would accommodate the asserted right at de minimis cost to those interests. *Turner*, 428 U.S. at 90.

HRDC does not identify an alternative mechanism that would fully accommodate the asserted rights at minimal cost. Instead, it relies on the observation that its publications are accepted without issue at other correctional facilities nationwide. Standing alone, that comparison does not establish the existence of an obvious, easy alternative within the meaning of *Turner*. *See Prison Legal News v. Chapman*, Civ. No. 3:12-CV-00125, 2013 WL 1296367, *5 (M.D. Ga. Mar. 26, 2012).

HRDC argues that the most obvious alternative to rejecting its publications is simply to deliver them. Doc. 46 at 8. But a significant portion of HRDC's mailings were, in fact, delivered. *See* Doc. 3 at 15; Doc 19 at 9; Doc. 29 at 16–17; Doc 114 at 3. For many of the mailings, HRDC has not demonstrated whether rejected materials were denied for legitimate penological reasons, administrative error, or inconsistent application of policy. Where an alleged violation cannot be tied to a clearly defined practice, the fourth *Turner* factor carries limited independent weight.

## III. Preliminary Injunction Factors Support a Narrowly Tailored Remedy Limited to Proven Violations

Having concluded that the *Turner* factors favor the Plaintiff with respect to the ban on all magazines, the Court now turns to the remaining requirements for a preliminary injunction. To obtain the preliminary injunction, the moving party must show (1) the movant is substantially likely to succeed on the merits; (2) the movant will suffer irreparable injury if the injunction is denied; (3) the movant's threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest. *Kobach*, 840 F.3d at 723. "Because a preliminary injunction is an extraordinary remedy, the right to relief

must be clear and unequivocal." *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003).

a. HRDC's Likelihood of Success Is Confined to Rejections Arising Specifically from the 2021 Memorandum's Magazine Prohibition

Under § 1983, a municipality may be held liable only when the alleged constitutional injury is caused by action taken pursuant to an official municipal policy or custom." *See Monell*, 436 U.S. at 691; *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013). Municipal liability does not attach simply because a constitutional violation occurred; rather, the challenged policy or custom must be the "moving force" behind the injury. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 400 (1997).

Accordingly, to establish causation, the challenged policy or practice must be "closely related" to the alleged deprivation of a federally protected right. *Schneider*, 717 F.3d at 770. To satisfy this requirement, the plaintiff must "demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Brown*, 520 U.S. at 404; *see also Martinez v. Carson*, 697 F.3d 1252, 1255 (10th Cir. 2012) (holding that the defendants are liable under § 1983 for the harm proximately caused by their conduct).

HRDC's alleged injury must therefore trace to an official NMCD policy or a settled custom that served as the moving force behind the challenged rejection. On this record, HRDC has not connected most of the rejections at issue to any such policy or custom. HRDC has not established whether those rejections resulted from policy implementation, administrative error, negligence, or targeted censorship.

Some rejections, however, stem from the 2021 Memorandum or reflect its mandates. HRDC has compiled the notations from the returned envelopes, grouping them by recurring reasons for rejection. For facilities operated by NMCD, at least two rejections are traceable to the

20

magazine ban.   In one instance, the Central New Mexico Correctional Facility ("CNMCF") rejected a *Prison Legal News* on June 23, 2023.  Doc. 3-2 at 61.  In the other, CNMCF rejected a *Criminal Legal News* on December 18, 2023.  *Id*. at 60.  Both rejection forms state that magazines are prohibited at the facility.  As discussed in the preceding sections, NMCD Defendants have not articulated a rational connection between the 2021 Memorandum's categorical prohibition on magazines and a neutral penological interest.  Because those rejections followed from the 2021 Memorandum, HRDC has shown a likelihood of success on its First Amendment claim as to those incidents.

Regarding the remaining rejections, HRDC has not shown that they were made pursuant to any specific NMCD policies, including the Mail Policy or the 2021 Memorandum.  HRDC therefore has not demonstrated a likelihood of success on its First Amendment claim as to the rest of the rejections.

> b.   Conclusion: The First Amendment Claim and Preliminary Injunction Standard Support Only Limited Relief

In sum, the first *Turner* factor weighs in HRDC's favor as applied to the 2021 Memorandum's magazine ban.   The asserted justification for a categorical prohibition on magazines fails to demonstrate a rational connection to the stated security concern.  The pleadings indicate that the 2021 Memorandum is enforced to some extent, if not uniformly, as evidenced by the June 23, 2023 form and the December 18, 2023 form, alongside other notations that categorically reject publications and magazines.  *Id*. at 60–61.  As to those occasions, HRDC has demonstrated a likelihood of success on its First Amendment claim.

As to the remaining rejections, however, HRDC has not shown that they are traceable to a clearly identified NMCD policy.  Absent such a showing, the Court will not issue a sweeping injunction untethered to a clearly identified policy or practice.  The preliminary injunction remedy,

21

by its nature, remains interlocutory, tentative, and limited.  *See U.S. ex rel. Bergen v. Lawrence*, 848 F.2d 1502, 1512 (10th Cir. 1988); *see also N.L.R.B. v. U.S. Postal Serv.*, 486 F.3d 683, 690 (10th Cir. 2007) (holding that injunctive relief should be "narrowly tailored to remedy the harm shown").

Accordingly, any preliminary injunctive relief is limited to prohibiting Defendants from enforcing the 2021 Memorandum to the extent it imposes a categorical ban on magazines based on scanner-related rationales.  The injunction does not require Defendants to accept all HRDC publications, bar rejections on other lawful grounds, or restrict discretionary decisions independent of the 2021 Memorandum.

## IV.    Due Process

   a.  <u>HRDC Has Shown a Likelihood of Success Regarding Rejection Notices That Lack Sufficient Specificity</u>

The Fourteenth Amendment provides that states shall not "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  To establish a due process violation, the plaintiff must first show a deprivation of a protected interest in life, liberty, or property.  *Zinermon v. Burch*, 494 U.S. 113, 125–26 (1990); *Hum. Rts. Def. Ctr. v. Bd. of Cnty. Comm'rs for Strafford Cnty.*, 654 F. Supp. 3d 85, 100 (D.N.H. 2023).

It is well established in both this circuit and Supreme Court precedent that publishers are entitled to procedural due process when correctional facilities reject incoming publications.  *See Procunier v. Martinez*, 416 U.S. 396, 417 (1974) ("[T]he decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards.").  As the Fifth Circuit noted, it is well-settled across the Fourth, Ninth, and Eleventh Circuits that certain level of due process "must accompany various decisions to exclude prison mailings."  *Prison Legal News v. Livingston*, 683 F.3d 201, 222–23; *see also Hum. Rts. Def. Ctr. v. Baxter Cnty.*, 360 F. Supp. 3d

870, 877 (W.D. Ark. 2019).  Once a protected interest is established, a plaintiff must then show that the interest was deprived without constitutionally adequate process.  *Zinermon*, 494 U.S. at 125–26.

Here, HRDC has shown that some rejection markings were so cursory that they did not convey the basis for the rejection.  *See* Doc. 3-2 at 44–45, 47, 50, 60–61.  Without meaningful explanations from the NMCD facilities, it remains unclear whether those rejections reflect a policy choice, negligence, or discretionary decision-making by individual staff.  That evidentiary gap defeats HRDC's First Amendment theory as to those rejections.  The same opacity, however, supports HRDC's procedural due process claim.  When NMCD provides no intelligible basis for rejecting a mailing, the defect bears directly on whether adequate process was afforded.

Some courts addressing this issue have applied the *Mathews v. Eldridge* framework, rather than the more demanding *Procunier* standard, to determine what process is due when prisons reject incoming publications.  *See Baxter Cnty.*, 360 F. Supp. 3d at 877; *Hum. Rts. Def. Ctr. v. Henderson Cnty.*, No. 4:20-CV-00159-JHM, 2022 WL 14740236, at *13 (W.D. Ky. Oct. 25, 2022); *Conyers v. Garrett*, No. 22-11152, 2022 WL 1913598, at *8 (E.D. Mich. June 3, 2022); *Hum. Rts. Def. Ctr. v. Johnson Cnty., Kan., Bd. of Comm'rs*, 507 F. Supp. 3d 1277, 1287 (D. Kan. 2020).  While the Tenth Circuit has not yet resolved the specific level of process due in this context, it established a baseline in *Jacklovich v. Simmons*: "[P]ublishers are entitled to notice and an opportunity to be heard when their publications are disapproved for receipt by inmate-subscribers."  392 F.3d 420, 433 (10th Cir. 2004).

Accordingly, while the precise contours of that process remain unsettled, HRDC is entitled to a baseline level of procedural due process.  Not surprisingly, courts confronted with this same question have reached different conclusions, particularly where mail is rejected under a rule of

23

general applicability rather than through content-based censorship. *See Baxter Cnty.*, 360 F. Supp. 3d at 877 (acknowledging circuit splits regarding the level of procedural due process owed); *see also Hum. Rts. Def. Ctr. v. Sherburne Cnty.*, No. CV 20-1817, 2020 WL 7027840, at *6 (D. Minn. Nov. 30, 2020) (concluding that the level of due process "may differ when mail is rejected pursuant to a rule of general applicability, rather than through content-based censorship").

Some courts have gone further and held that due process is not implicated at all where the sender has no right to participate in the decision-making process. *See Livingston*, 683 F.3d at 223 ("Giving notice to a sender that his communication has been rejected may be a reasonable courtesy, but such notice is not a requirement of due process.").

Relying on *Jacklovich*, the District of Kansas reiterated that the rejection of inmate mail must be accompanied by minimal procedural protections. *Johnson Cnty.*, 507 F. Supp. 3d at 1287. The court emphasized, however, that those protections do not require a formal appeal mechanism. *Id.* at 1288.

The court further distinguished generally applicable, content-neutral restrictions—such as a categorical ban on magazines—from content-based determinations. *Id*. It explained that *Jacklovich*'s requirement of both notice and an opportunity to appeal arose in the context where the challenged policy was treated as potentially content-based, which in turn pointed the court to the more demanding *Procunier* framework. *Id*. Regarding the level of notice required, markings or stamps on returned mail identifying the reason for rejection sufficed. *Id*. at 1287.

The Western District of Arkansas reached the same conclusion, finding that generally applicable, content-neutral restrictions present a low risk of erroneous deprivation, particularly when prisons reject bulk mail. *Baxter Cnty.*, 360 F. Supp. 3d at 881.

The Sixth Circuit likewise concluded that the routine enforcement of generally applicable, content-neutral mail rules requires less individualized process than content-based censorship. *See Bethel v. Jenkins*, 988 F.3d 931, 944 (6th Cir. 2021).

In sum, courts applying the *Mathews v. Eldridge* framework have concluded that additional procedural safeguards, such as a formal appeal mechanism, are not required under these circumstances.    Under *Eldridge*, the administrative burden associated with implementing additional procedures is a relevant consideration in determining the amount of process due. *Hum. Rts. Def. Ctr. v. Baxter Cnty.*, 999 F.3d 1160, 1167 (8th Cir. 2021) (affirming the district court's finding that the plaintiff's "eventual knowledge of the reason for refused mailing was sufficient to put Plaintiff on notice that further non-postcard mailings would also be rejected").

Even under the less stringent *Eldridge* framework, however, the Arkansas court concluded that the sender is entitled to notice of its rejected mailings and the specific reason for those rejections. *Baxter*, 360 F. Supp. 3d at 885. The court also held that requiring such a notice does not impose a substantial burden on prison administration. *Id*. at 883. The Court finds that reasoning persuasive.

Against that backdrop, the Court now addresses the specific process due to HRDC here. Because the 2021 Memorandum imposes a generally applicable, content-neutral prohibition on all magazines, the Court evaluates HRDC's procedural due process claim under *Mathews v. Eldridge*. That framework directs the Court to consider: first, the private interest affected by the official action; second, the risk of erroneous deprivation under the procedures used and the probable value of additional or substitute safeguards; and third, the government's interest, including the fiscal and administrative burdens that additional process would entail. *Mathews v. Eldridge*, 424 U.S. 319, 321 (1976).

25

Even under the less demanding *Eldridge* standard, due process requires a rejection notice identify a reason for the refusal. *See Baxter*, 360 F. Supp. 3d at 883. Here, many returned mailings provided HRDC only vague comments that failed to identify the policy provision allegedly violated or otherwise explain the basis for the rejections. *See* Doc. 3-2 at 44–45, 47, 50, 60–61. Notes stating merely "Refused," "Returned to Sender," or "RTS" do not supply enough information for a sender to understand why a mailing was rejected. *See Baxter*, 360 F. Supp. 3d at 885 ("Even the most basic due process protection includes the requirement that the sender . . . learn the reason(s) why his/her publications were rejected . . . . Thus, the Court finds that there was a technical due process violation.").

NMCD Defendants' argument—that due process relief is unavailable absent a successful First Amendment claim—is unpersuasive. Doc. 29 at 17–18. That position would require a sender to establish the unconstitutionality of a restriction without first being informed of the basis for the restriction itself, an inherently circular proposition incompatible with the principles of due process.

Accordingly, to the extent NMCD returned HRDC's mail with rejection notices so abbreviated or opaque that HRDC could not discern why the mailings were refused, HRDC has shown a likelihood of success on its due process claim as to those notices. *See* Doc. 3-2 at 44–45, 47, 50, 60–61. Due process requires that a publisher be able to learn why its mailings were rejected. *See Jacklovich*, 392 F.3d at 433. Minimal markings may be sufficient when they provide a clear basis for rejection, such as indicating that an inmate is no longer at the facility. But a bare notation such as "RTS" does not. *See Baxter*, 360 F. Supp. 3d at 885.

HRDC also argues that due process requires an opportunity to appeal each rejection. Doc. 3 at 22. At this stage, however, a preliminary injunction mandating individualized appeal for each rejected mail is unwarranted. As discussed above, courts have generally limited any appeal

26

requirement to cases involving content-based censorship. *See Sherburne Cnty.*, 2020 WL 7027840, at \*6. *Jacklovich*'s discussion of an opportunity to be heard arose in the context of potentially content-based determinations, where the risk of erroneous deprivation is heightened. *See Jacklovich*, 392 F.3d at 430.

Courts have rarely held that prisons must provide an opportunity to appeal each individual rejection in cases involving content-neutral restrictions. *See Jones*, 503 F.3d at 1163 (holding that a negligent act does not implicate the Due Process Clause); *Livingston*, 683 F.3d at 223; *Baxter Cnty.*, 360 F. Supp. 3d at 877; *Henderson Cnty.*, 2022 WL 14740236, at \*13; *Garrett*, WL 1913598, at \*8; *Johnson Cnty.*, 507 F. Supp. 3d at 1287. HRDC has failed to demonstrate that the majority of the challenged rejections resulted from either deliberate censorship or negligent enforcement. That lack of clarity matters under *Eldridge* because the need for additional procedural safeguards turns on the risk of erroneous deprivation created by the procedures in use. Under *Eldridge*, the government's interest is a relevant consideration. Requiring prisons to implement an appeal process for every rejection at the preliminary injunction stage would impose significant administrative costs absent a showing that such a mechanism is necessary.

Accordingly, HRDC has demonstrated a likelihood of success on the merits of its due process claim to the extent rejection notices failed to provide a meaningful explanation, but it has not shown an entitlement to an individualized appeal of each rejection or to repeated notices for rejections of the same publication.

b. The Remaining Factors Favor a Narrow Preliminary Injunction

HRDC will suffer irreparable harm if the rejection notices and markings fail to convey why its publications are rejected. Without meaningful notice, HRDC cannot understand the basis for rejection or conform its conduct to NMCD's rules going forward.

The balance of equities favors the narrowly tailored relief granted herein.  NMCD already maintains a publication review process and review panel at its facilities.  Requiring clearer rejection notices imposes a de minimis administrative burden while promoting transparency and consistency in enforcement.

The public interest is likewise served by ensuring that prison mail policies are applied in a uniform and intelligible manner, and that publishers receive adequate notice when publications are rejected.  This approach aligns with the Tenth Circuit's emphasis on notice in *Jacklovich*.  392 F.3d at 433.  At the same time, the public interest does not favor a broader injunction where the scope of any unconstitutional policy has not been established.

    c.    Conclusion Regarding the Constitutional Claims

In sum, although the *Turner* analysis raises constitutional concerns regarding a categorical ban on magazines justified solely by scanner limitations, HRDC has not shown the causal link necessary to establish a substantial likelihood of success on its First Amendment claim, except as to the several rejections expressly linked to the 2021 Memorandum.  Doc. 3-2 at 60–61.  A broader preliminary injunctive on First Amendment grounds is therefore premature.

Separately, HRDC has demonstrated a likelihood of success on its procedural due process claim to the extent that the rejection notices failed to provide a meaningful explanation.  Vague notations such as "RTS" do not permit HRDC to understand the basis for rejection and are insufficient under either *Eldridge* or *Procunier*.  Repeated notice for duplicate publications and opportunities to appeal each rejection, however, are not required.

## V.    Claims Against Private Parties

A private corporation may be held liable under § 1983 only if the corporation's own unconstitutional policy or custom caused the alleged injury.  *See Myers v. Okla. Cnty. Bd. of Cnty.*

28

*Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003).

    a.  <u>First Amendment Claim Against MTC</u>

Defendant MTC is a private corporation contracted by Otero County to operate the Otero County Prison Facility ("OCPF"). Doc. 103 at 2. MTC advances two main defenses to the First and the Fourteenth Amendment claims. MTC first contends that no MTC policy or custom served as the moving force behind the alleged constitutional violations, as it did not adopt or promulgate the challenged mail policies but was instead contractually bound to implement them. Doc. 114 at 7.

MTC further asserts that it does not engage in ongoing censorship of HRDC's publications. *Id*. at 3. According to MTC, HRDC's publications are "consistently available" to OCPF inmates in the facility's library. *Id*. MTC also distinguishes between routine and non-routine mail. Routine mail is sorted by a third-party vendor, Smart Communications, while non-routine mail is handled by staff in the dormitory where the intended recipient is housed. *Id*. In making that distinction, MTC appears to suggest that the rejection of routine mail, including marketing materials, is not attributable to its own discretionary acts.

In response, HRDC counters that no NMCD mail policy draws a distinction between routine and non-routine mail. Doc. 119 at 4. HRDC further argues that, by creating this distinction, MTC necessarily exercises independent discretion in applying NMCD's mail policies. *Id*. at 5.

At this stage, however, MTC's asserted role in processing routine versus non-routine mail, standing alone, does not permit the Court to conclude that the rejection of HRDC's materials resulted from an MTC policy or custom.

HRDC also alleges that MTC has not identified the number and type of HRDC publications available in the OCPF library, and argues that limited library access is not a constitutionally adequate alternative to individual subscriptions. *Id*. at 7. The Court need not resolve these factual disputes at this stage. For purposes of the preliminary injunction motion, HRDC has not shown that an MTC policy or custom was the moving force behind the alleged First Amendment violations.

    b.   Fourteenth Amendment Claim Against MTC

However, MTC's failure to provide adequate notice constitutes a separate procedural due process violation. To support its due process claim against MTC, HRDC complied the rejection markings appearing on returned mail sent to OCPF and identified several recurring categories. *See* Doc. 103-2 at 10–15.

One category consists of notes instructing HRDC to redirect correspondence to Smart Communications, a third-party vendor. *See id*. These markings communicate that the facility routes certain mails through a vendor rather than processing it internally, and they instruct the sender on how to proceed. Such notations sufficiently inform HRDC of the basis for non-delivery and therefore satisfy the requirements of procedural due process.

A second category comprises notes that identify a publication and state it was not approved, including notations such as "*PYHS* Refused." *See id* at 14–15. Due process does not require repeated notice where the facility has already explained why such publications were rejected. *See Livingston*, 683 F.3d at 223. Absent a prior explanation, however, these markings fail to provide HRDC with meaningful notice.

Another recurring category consists of markings stating: "no books, magazines, or newspapers (item sent to Smart Communications)." *See* Doc. 103-2 at 10–15. These markings clearly communicate the reason for rejection and therefore satisfy the requirements of procedural

due process.  These notations do not necessarily raise First Amendment concerns because the facility is not categorically rejecting all publications; rather, it is directing that they be forwarded to the approved third-party vendor.

Before the entry of this Order, MTC could plausibly claim that the alleged constitutional violations were not attributable to an MTC policy or custom.  The Court recognizes that position.  Following the issuance of this Order, however, MTC is on notice that such a justification is no longer tenable regarding future mailings.  To the extent the Court enjoins enforcement of the 2021 Memorandum's categorical ban on magazines, any continued rejection of magazines or publications by MTC would rest on MTC's own policy or practice rather than on state authorization.  In that circumstance, MTC could not characterize itself as a mere conduit for state mail policy, as the 2021 Memorandum would no longer provide a valid source of authority.

   c.   Plaintiff's Motion for Preliminary Injunction is Moot as to GEO

GEO operates the Lea County Correctional Facility ("LCCF") pursuant to a contract with Lea County, which in turn contracts with NMCD to house state prisoners.  FAC ¶ 16.  Although GEO does not contract directly with NMCD, it is contractually obligated to comply with NMCD policies and procedures, including those governing inmate mail and correspondence.  Doc. 19 at 3.

Consistent with the relief sought against other Defendants, HRDC moves to enjoin GEO "from implementing unconstitutional mail policies and practices."  Doc. 103 at 2.  In its December 12, 2024 response, GEO emphasizes the limited role it played in housing NMCD's inmates and argues that it was not responsible for NMCD's mail policies.  *See* Doc. 159 ¶ 5.

On June 30, 2025, GEO's contract with Lea County expired and was not renewed.  *Id.* ¶ 6.  GEO represents that all state inmates formerly at LCCF have been transferred to other NMCD facilities, and no state prisoners have been housed at LCCF since June 2025.  *Id.*  Previously, the

Court issued a narrowly tailored preliminary injunction prohibiting Defendants from enforcing the 2021 Memorandum to the extent it imposes a categorical ban on magazines based on scanner-related rationales. *See* Doc. 151. Under that ruling, Defendants must also specify the grounds for rejecting HRDC's materials. *See id.*

Because the preliminary injunction governs future conduct and HRDC's requested relief also seeks to prevent prospective harm, the measures do not apply to GEO. Since GEO no longer operates LCCF, it is no longer able to affect HRDC's rights. Accordingly, the Court finds that HRDC's motions for preliminary injunction are moot as to GEO, and the injunctive relief granted herein does not extend to GEO, a conclusion which HRDC does not oppose. *See* Doc. 159 at 2.

Under Federal Rule of Civil Procedure 54(b), a district court can revise its interlocutory orders at any time before the entry of a final judgment. *See Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1225 (10th Cir. 2007) ("[D]istrict courts generally remain free to reconsider their earlier interlocutory orders."). The grant or denial of injunctive relief, as well as a refusal to dissolve or modify an existing injunction, is within the discretion of the district court, and its decision will not be reversed absent an abuse of that discretion. *Cablevision of Tex. III, L.P. v. Okla. W. Tel. Co.*, 993 F.2d 208, 210 (10th Cir. 1993). Accordingly, the Court revises its previous Memorandum Order (Doc. 151) and clarifies that the injunctive relief does not extend to GEO.

**VI.      The Bond Requirement Should Be Waived Due to the De Minimis Cost of Compliance**

As a prerequisite to the issuance of a preliminary injunction, Federal Rule of Civil Procedure 65(c) requires the moving party to post a security bond "to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c); *Front Range Equine Rescue v. Vilsack*, 844 F.3d 1230, 1232–33 (10th Cir. 2017).

Accordingly, the Court must consider whether a bond is necessary before issuing a preliminary injunction. *See Flood v. ClearOne Comm'ns*, 618 F.3d 1110, 1126 n.4 (10th Cir. 2010); *see also Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987) (concluding that where a trial court does not "contemplate the imposition of [a] bond, its order granting a preliminary injunction is unsupportable").

In the Tenth Circuit, courts "have wide discretion under Rule 65(c) in determining whether to require security" and may therefore impose no bond where the circumstances warrant. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1215 (10th Cir. 2009) (affirming district court's decision to waive a bond where there appeared to be no harm). A bond may be "unnecessary to secure a preliminary injunction if there is an absence of proof showing a likelihood of harm." *Coquina Oil Corp.*, 825 F.2d at 1462.

MTC urges the Court not to waive the bond requirement, arguing that an erroneously imposed preliminary injunction would expose it to significant costs, including developing and implementing new mail procedures, training staff, and educating inmates regarding any changes. Doc. 114 at 8–9.

HRDC responds that no bond is warranted because the preliminary injunction it seeks would not require MTC, at this stage, to formulate new policies or implement new mail-processing systems. Doc. 119 at 12.

The Court waives the bond requirement. The preliminary injunction the Court is issuing is narrowly tailored, requiring only that Defendants cease their blanket ban on magazines and specify the grounds for rejecting HRDC's materials, an obligation that imposes no significant administrative or fiscal burden. NMCD facilities already maintain a publication review process and a review panel that evaluates each initially rejected publication. Policy at 9–10. Requiring

Defendants to identify the specific basis of a rejection, rather than relying on conclusory notations such as "RTS," does not require an overhaul of existing mail-processing systems. Under these circumstances, the Court finds that a bond is unnecessary.

## CONCLUSION

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Unopposed Motion to Revise the Court's Memorandum Order Filed February 20, 2026 is **GRANTED**. Plaintiff's motions for preliminary injunction are **GRANTED IN PART** and **DENIED IN PART**.

_____
**SARAH M. DAVENPORT**
**UNITED STATES DISTRICT JUDGE**